8 Cal.4th 398 (1994)
878 P.2d 1297
33 Cal. Rptr.2d 85
In re JASMON O., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
GAVIN O., Defendant and Appellant.
Docket No. S030556.
Supreme Court of California.
September 2, 1994.
*407 COUNSEL
Meyer I. Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.
Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, James H. Wellman, E. Jane Via and Gary C. Seiser, Deputy County Counsel, and Lee W. Selvig for Plaintiff and Respondent.
Jennings, Engstrand & Henrikson, Debra K. Maurer and Dearing D. English as Amici Curiae on behalf of Plaintiff and Respondent and Minor.
Robert Wayne Gehring, under appointment by the Court of Appeal, for Minor.
OPINION
MOSK, J.
Jasmon O. is now seven and a half years old. She has resided with her foster parents, who wish to adopt her, since she was an infant of six months. Her natural father asserts that it is in Jasmon's best interests not to terminate his parental rights but to transfer Jasmon's custody to him.
A court hearing an action to terminate parental rights under former Civil Code section 232[1] must consider, when a child has been in an out-of-home placement supervised by the juvenile court for a year, whether "return of the child to the child's parent or parents would be detrimental to the child" and whether "the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child." (Id., subd. (a)(7).) We conclude that there was sufficient evidence in this case to support the trial court's conclusion that detriment to the child and parental inadequacy warranted termination of the father's parental rights. We also conclude that the Court of Appeal erred in determining that the appeal *408 from the termination judgment was moot. Finally, we conclude that the Court of Appeal erred in holding that a court hearing a petition under Welfare and Institutions Code section 388[2] may not find that the child's best interests require the setting aside of an earlier juvenile court order on the basis of evidence that the child will suffer long-term, serious emotional damage if the bond with foster parents is severed. Accordingly, the judgment of the Court of Appeal is reversed.

I. FACTS
Jasmon O. was born on December 14, 1986. Six months later, on June 18, 1987, her mother relinquished her to the Child Protective Services of San Diego County, stating that she was unable to care for the infant. It is uncontested that Jasmon's father was then also unable to care for the child, as he was living in an "independent living center" for mentally disturbed persons and was also suffering from drug dependency. Jasmon was declared a dependent child on July 1, 1987, and placed in foster care in the home of the A.'s on July 7, 1987. Despite a conflict of interest on the part of the San Diego County Department of Social Services (Department) in placing the child in this home, the home proved to be a good one, and the child has resided there throughout these proceedings.
During dependency proceedings, the mother failed to comply with the reunification plan. Her parental rights have been terminated and she has not appealed. The father, however, after a period between a year and a year and a half after Jasmon was placed with the A.'s, transformed himself. He overcame his drug dependency, underwent psychological counseling, secured employment, established a home and maintained regular visitation with Jasmon.
A permanency planning hearing began on February 17, 1989, and continued on various dates until May 12, 1989. The juvenile court referee heard evidence that despite his general recovery, the father had failed to establish a close relationship with his daughter, and that Jasmon experienced separation anxiety as visitation with her father increased. The referee heard evidence that the father failed to or was unable to empathize with his daughter's distress.
The father presented evidence that Jasmon's mother's social worker, also an employee of the Department, was instrumental in securing the placement of Jasmon with the social worker's sister, who was the foster mother. The *409 Department did not inform the father or the court of this fact. The referee was sharply critical of the Department for permitting this potential conflict of interest, but found it had not ultimately affected the attempted reunification of Jasmon with her father.
The referee found it would be detrimental to Jasmon to return her to her father's custody. However, it did not select a permanent plan and did not refer the minor for adoption, but ordered the Department to make recommendations regarding guardianship or long-term foster care.
The matter came on for consideration of the Department's report regarding guardianship or long-term foster care, and the father petitioned pursuant to section 388 for modification or to set aside the previous order finding it would be detrimental to transfer Jasmon to his care. On November 11, 1989, the court denied the petition under section 388 for lack of sufficient new evidence. A "further" contested hearing to select a permanent plan came on for trial, but the father made a motion for mistrial on the ground that he was entitled to a new permanency planning hearing on the merits, including relitigation of the issue of detriment, and a mistrial was ordered December 1, 1989.
A retrial of the entire permanency planning hearing began January 22, 1990, and concluded March 14, 1990. A second referee heard evidence that Jasmon suffered separation anxiety as visitation with her father increased, and that the father lacked empathy for her distress. There was testimony that Jasmon was mentally healthy but that a transfer of custody from the foster parents to her father would probably be very disturbing to her. There was again evidence that the father had failed to form a substantial bond with Jasmon. The second referee also criticized the Department for its conflict of interest in placing Jasmon with the A.'s, but, again, found the conflict had not actually affected the reunification efforts in this case. Expressing "considerable hesitancy," the referee found that the child should be returned to her father, finding no substantial risk of detriment to her physical or emotional well being "beyond the immediate short term." The order was stayed pending a transition schedule ordered April 19, 1990. The psychologist supervising the transition had authority to halt the transition plan upon notice to the parties.
The psychologist supervising the transition plan halted the transition because of the child's mental distress in September 1990. After further difficulties with visitation and an allegation of sexual molestation levied against the father, the Department petitioned on March 18, 1991, to set aside or modify the March 14, 1990, order pursuant to section 388. The Department also moved that reunification services be terminated and that the court order a new permanent plan  adoption.
*410 At the hearing on the petition pursuant to section 388, a third referee heard lengthy testimony regarding Jasmon's current psychological status and the unfortunate progress of the transition plan. The evidence was that despite increasing visitation with the father during the transition plan, including extended weekend and overnight visits, she had still formed no significant bond with him, and that the increased visitation had caused her great anxiety. During the transition period, she developed a serious mental illness, consisting of a deep separation anxiety that was not age-appropriate or merely situational, and a fixed and settled depression with long-term implications for her mental health. There was evidence that the father had failed to comply with the specifics of the transition plan, in that he told Jasmon she was coming to live with him permanently before her therapist had prepared her for this information. He also failed to cooperate with the child's therapist in participating in therapy with him. There was also evidence that the father did not notice or denied the obvious symptoms of mental distress exhibited by the child during the transition period.
On May 15, 1991, the referee concluded that the Department had carried its burden of demonstrating that the previous order should be set aside because new evidence established that it was not in the best interests of the child to be placed with her father. The referee made no finding with respect to the allegations of sexual molestation. The referee also determined that placement with the father would be detrimental to the child, and ordered the Department to file an action under former Civil Code section 232 for termination of parental rights. The father filed a notice of appeal from this order.
On September 9, 1991, the superior court commenced a hearing under former Civil Code section 232, with testimony from a county probation officer, one of the Department's social workers, and three psychologists, as well as the father. The court made a de novo determination on October 1, 1991, that although reasonable reunification services had been offered, it would be detrimental to the child to return her to her father, that the father had failed or was likely to fail to maintain an adequate parental relationship, and that the child should be freed from his custody and control for adoption. The father separately appealed from this order.

II. COURT OF APPEAL OPINION
The Court of Appeal reversed the order of the juvenile court referee granting the Department's petition pursuant to section 388 to set aside the second permanency planning order. It declared that the petition pursuant to section 388 contained insufficient factual allegations to warrant a hearing, *411 and that in any case, there was insufficient new evidence to support the referee's order granting the petition. It also purported to order the child returned to her father, though there was an independent judgment of the superior court terminating the father's parental rights pursuant to former Civil Code section 232. The Court of Appeal did not reverse this judgment, but dismissed the appeal from the judgment as moot.
The Department and the minor petitioned for review, and we reverse.

III. DISCUSSION

1. Dismissal of Appeal

(1a) The Department argues that the Court of Appeal erred in dismissing the appeal from the termination order as moot. We agree.
The Department filed an action in the superior court pursuant to former Civil Code section 232, subdivision (a)(7), which provided in pertinent part that: "An action may be brought for the purpose of having any child under the age of 18 years declared free from the custody and control of either or both of his or her parents when the child comes within any of the following descriptions: ... [¶] ... [¶] [The child] has been in out-of-home placement under the supervision of the juvenile court, the county welfare department, or other [] agency for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child."
(2) An action pursuant to former Civil Code section 232 is an independent proceeding in the superior court. (In re Kristin B. (1986) 187 Cal. App.3d 596, 604 [232 Cal. Rptr. 36]; In re Shannon W. (1977) 69 Cal. App.3d 956, 961-962 [138 Cal. Rptr. 432]; see also In re Marilyn H. (1993) 5 Cal.4th 295, 302 [19 Cal. Rptr.2d 544, 851 P.2d 826].) The proceeding has a different purpose than the dependency proceedings. It is intended to pave the way for adoption or other permanent, conclusive placement, rather than, as in the dependency action, to provide for temporary custody and amelioration of the family environment. (See In re Shannon W., supra, 69 Cal. App.3d at pp. 961-962; see also In re Norma M. (1975) 53 Cal. App.3d 344, 346 [125 Cal. Rptr. 721].) Unlike the statutory scheme applicable in dependencies established after January 1, 1989, the section 232 action does not function as a review of the proceedings in the juvenile court. *412 (See Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 253, fn. 8 [19 Cal. Rptr.2d 698, 851 P.2d 1307].) The action pursuant to former Civil Code section 232 may be brought without any order from the juvenile court authorizing or directing the filing of the action (In re Joshua S. (1986) 186 Cal. App.3d 147, 154 [230 Cal. Rptr. 437]; see also Jones T. v. Superior Court (1989) 215 Cal. App.3d 240, 248, fn. 7 [264 Cal. Rptr. 4]), and, in fact, may be brought while the dependency proceedings are still under way. Thus, it may supersede the dependency action. (See In re Shannon W., supra, 69 Cal. App.3d at p. 962.) The superior court hearing the matter is required to make an independent finding, on the basis of clear and convincing evidence, satisfying the requirements of former Civil Code section 232, subdivision (a)(7), including findings that return of the child to the parent would be detrimental to the child (In re Angela R. (1989) 212 Cal. App.3d 257, 266 [260 Cal. Rptr. 612]; see also Cynthia D. v. Superior Court, supra, 5 Cal.4th at p. 253, fn. 8), and that the parents have failed, and are likely to fail in the future, to maintain an adequate parental relationship. Under the terms of the statute, an action pursuant to former Civil Code section 232, subdivision (a)(7), is dependent upon previous juvenile court orders only to the extent that the action may be brought only after juvenile court jurisdiction has been established over the child, and an out-of-home placement has continued for at least a year.
(1b) Because the former Civil Code section 232 action is independent from the dependency proceedings, has a different purpose, and in fact normally supersedes the dependency proceedings, we are at a loss to understand how the appeal from the section 232 action could be moot because of the disposition of an appeal from an order in the dependency proceeding. We are aware of no authority for such a rule.
The father argues that the judgment terminating parental rights may be collaterally attacked by way of the appeal from the order setting aside the earlier permanency planning order. He maintains that if, as the Court of Appeal held, the juvenile court referee erred in setting aside the permanency planning order directing that Jasmon's custody should be returned to her father, there was no basis for an action pursuant to former Civil Code section 232, subdivision (a)(7), because the child was not in an "out-of-home placement" under the terms of that provision. Once the section 388 order is reversed, he claims, the earlier order for return to the father is reinstated, vitiating the "out-of-home placement" that was a predicate to the bringing of the section 232 action.
There are at least four flaws in this argument. First, it is not necessary to collaterally attack the judgment in the former Civil Code section 232 action, *413 because the order is appealable (former Civ. Code, § 238) and an appeal was perfected in this case. Second, the juvenile court referee's order directing that Jasmon's custody be returned to her father was stayed pending the completion of the transition plan, and that plan was never completed. Thus the order never went into effect, and, in fact, the child remained in the out-of-home placement during the entire proceedings. Thus, the father's technical argument about the jurisdictional predicate for commencing the former Civil Code section 232 action fails.
Third, the Court of Appeal did not recognize a collateral attack on the superior court judgment, but simply ignored that judgment as if it had become a nullity. Given the independent nature of the former Civil Code section 232 action described above, we do not believe that the Legislature intended to provide for a superior court action that would produce a judgment that could simply be ignored if a juvenile court order that preceded the superior court action were reversed on appeal. Apart from the incongruity of such a procedure with the apparent legislative intent in enacting former Civil Code section 232, such a procedure would put the trial court on remand in a remarkably awkward position. Normally the involuntary dismissal of an appeal leaves the judgment intact. (Conservatorship of Oliver (1961) 192 Cal. App.2d 832, 835-836 [13 Cal. Rptr. 695]; Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 1989) ¶ 5:48, p. 5-10; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeals, § 528, p. 513.) Thus the Court of Appeal left intact the superior court order terminating parental rights, and that judgment is not subject to collateral attack in the trial court. (Former Civ. Code, § 238.)
(3) In fact, normally the former Civil Code section 232 judgment itself renders moot the earlier juvenile court orders, unless an error in the dependency proceedings would actually taint the superior court's order terminating parental rights. (In re Angela R., supra, 212 Cal. App.3d at p. 261; In re Kristin B., supra, 187 Cal. App.3d at p. 605; see also In re Linda P. (1987) 195 Cal. App.3d 99, 105 [240 Cal. Rptr. 474].) Thus, in In re Kristin B., supra, 187 Cal. App.3d 596, the court explained that the dependency action is quite separate from the section 232 action, and that error in the juvenile court proceedings would normally have no effect on the section 232 proceeding. An exception to this general rule occurs, it explained, "[f]or example, where the termination judgment is based solely upon testimony improperly ruled admissible at a permanency planning hearing, the judgment's propriety is questionable. And where the superior court's jurisdiction to entertain a petition for freedom from parental control is predicated on a child's dependency status or out-of-home placement ... which arose out of an erroneous jurisdictional finding of the juvenile court, the ultimate judgment may be a nullity." (In re Kristin B., supra, 187 Cal. App.3d at p. 604, *414 fns. omitted.) We agree with the court's conclusion that the section 232 judgment generally moots any appeal from orders in the dependency proceedings except that "where a judgment terminating parental rights is challenged on appeal, an earlier appeal arising out of a juvenile court dependency proceeding is not moot if the purported error is of such magnitude as to infect the outcome of the ensuing termination action or where the alleged defect undermines the juvenile court's initial jurisdictional finding." (187 Cal. App.3d at p. 605; accord, In re Angela R., supra, 212 Cal. App.3d at p. 261.)
(1c) Here, the father argues that the referee's error in granting the petition brought pursuant to section 388 was an error of such magnitude that it infected the former Civil Code section 232 proceedings, because, without the error, the section 232 action would never have been filed. Therefore, he claims, the section 232 judgment does not render his claims with respect to the section 388 order moot. We reject his analysis, because it would provide that every error leading to a permanency planning hearing could be raised on appeal from the section 232 judgment. Further, as we have said above, the success of the section 388 petition was not, in fact, a necessary predicate to the filing of the section 232 action.
In any case, the juvenile court did not err. The fourth flaw in the father's arguments in favor of the order of the Court of Appeal dismissing the appeal from the former Civil Code section 232 action is his assumption that the juvenile court referee erred in granting the petition pursuant to section 388. It did not. We shall discuss the merits of this point below because it is the basis for the decision of the Court of Appeal, and it was in this context that the Court of Appeal discussed the issue of the child's bonding to her foster parents. We conclude at this point that the Court of Appeal erred in dismissing the appeal from the judgment in the action brought pursuant to former Civil Code section 232.

2. Welfare and Institutions Code Section 388

The Court of Appeal held the Department alleged insufficient evidence in its petition pursuant to section 388 to warrant a hearing on the petition, and that there was insufficient evidence introduced at the hearing to support the order granting the petition. The court held that the referee had erred in relying exclusively on evidence that it was not in the child's best interests to disrupt her psychological bond with her foster parents.
The Court of Appeal erred.
Section 388 provides in pertinent part that: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court *415 ... may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."
(4a) The petition pursuant to section 388 lies to change or set aside any order of the juvenile court in the action from the time the child is made a dependent child of the juvenile court (In re Stephanie M. (1994) 7 Cal.4th 295, 316 [27 Cal. Rptr.2d 595, 867 P.2d 706]; In re Marilyn H., supra, 5 Cal.4th at pp. 308-309), including the order after a permanency planning hearing. (See, e.g., In re Stephanie M., supra, 7 Cal.4th 295; In re Marilyn H., supra, 5 Cal.4th 295; In re Heather P. (1989) 209 Cal. App.3d 886, 891-892 [257 Cal. Rptr. 545].)
The petition for modification must contain a "concise statement of any change of circumstance or new evidence that requires changing the [previous] order." (Cal. Rules of Court, rule 1432(a)(6).) The petition must be liberally construed in favor of its sufficiency. (Id., rule 1432(a); see also In re Marilyn H., supra, 5 Cal.4th at p. 309.) As one court has explained, "if the petition presents any evidence that a hearing would promote the best interests of the child, the court will order the hearing." (In re Heather P., supra, 209 Cal. App.3d at p. 891.)
(5) Applying these standards, we think it obvious that the Department alleged sufficient change of circumstance or new evidence to meet the liberal pleading requirements of section 388 by alleging, among other things, that the father was failing to comply with the court-ordered transition plan, that there was still no adequate parent-child relationship (despite months of effort during the transition plan), and that the child had alleged an act of sexual abuse.
(6a) At the hearing on the petition pursuant to section 388, the juvenile court's task was to determine whether the Department had demonstrated by a preponderance of the evidence that there was new evidence or a change of circumstances demonstrating that it was in Jasmon's best interests that the previous permanency planning order, which provided that her custody be gradually transferred from the A.'s to her natural father, be changed, modified or set aside. (See In re Stephanie M., supra, 7 Cal.4th at p. 317; In re Audrey D. (1974) 100 Cal. App.3d 34, 45 [160 Cal. Rptr. 802].) In an abundance of caution, the referee stated that the court was applying a clear and convincing evidence standard. (4b) The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (In re Stephanie M., *416 supra, 7 Cal.4th at p. 318, In re Michael B. (1992) 8 Cal. App.4th 1698, 1704 [11 Cal. Rptr.2d 290].)
(6b) We conclude there was substantial new evidence that supported the juvenile court referee's decision to set aside the previous order as not in the best interests of the child.
The child's treating psychologist, Dr. Lincoln, testified that he halted progress of the transition plan from one phase to the next because of the increasing anxiety Jasmon exhibited when exposed to longer and more frequent visits with her father. Even when visitation was reduced, she exhibited anxiety, and when the father told her she was coming to live with him permanently she developed serious "high intensity" anxiety symptoms. Dr. Lincoln diagnosed Jasmon as having developed a separation anxiety disorder that she did not have before the transition plan, and testified that her long-term prognosis if the transition plan were resumed would be depression and difficulty forming relationships. He also expressed concern at the father's apparent lack of recognition that Jasmon was experiencing significant anxiety and pain during this period, and testified confidently that the father would aggravate her trauma if the court did not end the transition from the A.'s to the father. He testified that his opinion against placement with the father was stronger than it had been at the earlier hearing because his fears, originally based on hypotheses, had been borne out by events.
Dr. Murphy, a child psychologist, agreed with Dr. Lincoln that Jasmon was suffering from a mental disorder, namely, separation anxiety disorder. He was of the opinion that the disorder was caused by Jasmon's attachment to her foster parents and the natural father's inability to deal empathetically with that attachment during the transition and to evoke any attachment to himself. He was of the opinion that to continue with the transition of her custody from the A.'s to the father would cause her serious lifelong emotional detriment.
Finally, Dr. Callan, a psychoanalyst and expert in the field of child psychology who had no previous contact with the case, testified in the strongest terms that during the period of the transition plan Jasmon had developed a serious mental illness. She diagnosed Jasmon as suffering from separation anxiety and depression, and testified that this condition was not simply situational but had become a fixed personality disorder because of the trauma Jasmon had experienced in attempting to make the transition from the A.'s to her natural father. The doctor testified that "this child is deeply afraid," and that the child's problems were not caused so much by separation from the A.'s, but by the child's fear that her emotional needs *417 would not be met by her natural father. The doctor testified that "[s]he simply cannot tolerate more stress and particularly cannot tolerate an arrangement that is going to create a major loss." Dr. Callan was of the opinion that the child's depression would not be resolved within the next year and warned against transferring the child's custody to any person who could not empathize with her and recognize how upset and disturbed she was.
In addition, there was evidence that Jasmon had exhibited extreme anxiety to her caregivers during the transition plan, developing irrational fears, anger, difficulty relating to peers and disruption of toileting and sleeping patterns. She also developed violent fantasies involving her kidnapping.
Even the father's psychologist, who found the father to be an adequate parent, agreed with the other experts that Jasmon was too fragile to be transferred to her father's custody in the near future.
The above evidence, all directed to events occurring after the second permanency planning order, overwhelmingly demonstrated that the previous order was not in the child's best interests because its execution caused her to develop a mental illness.
Thus, our review of the record demonstrates that the Court of Appeal erred when it declared that, at the hearing pursuant to section 388, "there was no new evidence of any substance which had not already been previously heard...." The Court of Appeal's assertion that the juvenile court referee simply reevaluated the evidence already considered in the previous hearing, and substituted its judgment for that of the previous referee, is wrong.
The Court of Appeal was of the opinion that the evidence regarding the child's mental distress could not properly be the basis for the referee's decision on the question of the child's best interests under section 388. The Court of Appeal declared that: "Going to the heart of the matter, it is clear that the only legal basis for the efforts to stop the transfer of Jasmon to her father's custody related to Jasmon's distress at the process itself."
The Court of Appeal relied on In re Venita L. (1987) 191 Cal. App.3d 1229 [236 Cal. Rptr. 859]. In that case, the juvenile court held a permanency planning hearing and authorized the filing of a petition to terminate parental rights under former Civil Code section 232, but failed to make a necessary finding on the record that return of the child to her natural parent would be detrimental. On appeal from the permanency planning order, the minor *418 argued that the finding of detriment could be established from a review of the record. The Court of Appeal disagreed, observing that the only evidence of detriment came from psychologists who testified it would be psychologically detrimental for the child to be removed from her foster home, where she had established a primary psychological bond with the foster parents.
The Court of Appeal in In re Venita L., supra, 191 Cal. App.3d 1229, acknowledged that evidence of such bonding was significant but declared that "[i]f a child's immediate bonding or attachment to foster parents could outweigh all other considerations, then reunification services, especially in the case of a very young child such as Venita L., would serve no meaningful purpose. At best the court would merely pay lip service to the concept of parenting as a fundamental constitutional right. A dependent child's psychological bond with a foster parent may not be so easily used to satisfy the requirement of [detriment]." (Id. at p. 1240; see also In re Kristin W. (1990) 222 Cal. App.3d 234, 252-253 [271 Cal. Rptr. 629] [detriment not established at permanency planning hearing simply because children are "`happy and satisfied'" in foster home]; In re Rodrigo S. (1990) 225 Cal. App.3d 1179, 1187 [276 Cal. Rptr. 183] [loss of successful bond insufficient to support finding of detriment in termination of parental rights proceeding]; but see In re Jonathan R. (1989) 211 Cal. App.3d 1214, 1221 [259 Cal. Rptr. 863] [detriment may be established by evidence of bonding to foster parents].)
We have no quarrel with the assertion that the existence of a successful relationship between a foster child and foster parent cannot be the sole basis for terminating parental rights or depriving the natural parent of custody in a dependency proceeding. The evidence here was of a different order. It established that the severing of the bond with the foster parents would do serious, long-term emotional damage to Jasmon.
Of course, here the referee hearing the petition brought under section 388 was not faced with all the issues presented by a termination of parental rights. At the section 388 hearing, the question was whether there was new evidence that the best interests of the child required that the previous order returning the child to her father be set aside. (7a) We do think that in the context of this hearing, after a lengthy period of foster care initially made necessary because both parents were quite unfit to care for their child, evidence that the attempt to transfer custody from the foster parents to the natural parent has caused the child to develop serious mental illness may establish that it is not in the child's best interests to be returned to the natural parent. Although courts determining a child's best interests under section 388 should carefully evaluate whether a child's distress in severing a temporary bond is simply situational, and not base their decisions on a *419 transitory problem, courts may place great weight on evidence that after a substantial period in foster care, the severing of a bond with the foster parents will cause long-term, serious emotional damage to the child.
We reach this conclusion because we are of the opinion that when a child has been placed in foster care because of parental neglect or incapacity, after an extended period of foster care, it is within the court's discretion to decide that a child's interest in stability has come to outweigh the natural parent's interest in the care, custody and companionship of the child. (In re Marilyn H., supra, 5 Cal.4th at pp. 307-309.)
(8) The parent has a fundamental right to maintain the parent-child bond and to the care, custody and companionship of his or her child. (In re Marilyn H., supra, 5 Cal.4th at p. 306; Cynthia D. v. Superior Court, supra, 5 Cal.4th at p. 253; see also Adoption of Kelsey S. (1992) 1 Cal.4th 816, 849 [4 Cal. Rptr.2d 615, 823 P.2d 1216] [right of unwed fathers to establish parental relationship].) However, the right is not absolute and may be abridged when it is necessary to do so to protect the welfare of the child. (In re Marilyn H., supra, 5 Cal.4th at p. 307.) Thus, in this case, no one would dispute that it was necessary to abridge the natural father's right to the care and companionship of his child when she was placed in the foster home, and for an extended period thereafter, because the father was unable to care for the child.
Children, too, have fundamental rights  including the fundamental right to be protected from neglect and to "have a placement that is stable [and] permanent." (In re Marilyn H., supra, 5 Cal.4th at p. 306; see also Cynthia D. v. Superior Court, supra, 5 Cal.4th at p. 253; In re Angelia P. (1981) 28 Cal.3d 908, 919 [171 Cal. Rptr. 637, 623 P.2d 198]; In re Albert B. (1989) 215 Cal. App.3d 361, 377 [263 Cal. Rptr. 694].) Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent. (In re Angelia P., supra, 28 Cal.3d at pp. 916-917.)
Our task is to interpret the statutory scheme as a whole in a manner that balances the interest of parents and children in each other's care and companionship, with the interest of abandoned and neglected children in finding a secure and stable home. (See In re Angelia P., supra, 28 Cal.3d at pp. 916-917; see also In re Marilyn H., supra, 5 Cal.4th at p. 307.) We have recently performed this task in determining that a parent's due process rights are not violated by a rule that reunification with the parent is not a subject of reconsideration in a termination of parental rights proceeding pursuant to section 366.26. We reached this conclusion because we found that after a *420 child has spent a substantial period in foster care and attempts at reunification have proved fruitless, the child's interest in stability outweighs the parent's interest in asserting the right to the custody and companionship of the child. (In re Marilyn H., supra, 5 Cal.4th at pp. 307-309.)
(9) As we pointed out in In re Marilyn H., supra, 5 Cal.4th 295, 308, at the beginning of the dependency proceedings, our statutory scheme expresses a presumption in favor of keeping parents and children together. The burden of proof is on the Department to show that an out-of-home placement is necessary at the commencement of the proceedings (§ 361); and, at the mandatory review hearings every six months thereafter, the presumption is that the child should be returned to the parent unless the Department demonstrates that the child's return would "create a substantial risk of detriment to the [child's] physical or emotional well-being." (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Nonetheless, the Legislature also recognizes the child's interest in a stable, permanent home (§ 366.25, subd. (a)), and has provided that the juvenile court should avoid delay and "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a).) The current statutory scheme makes it clear that the turning point at which the child's interest may outweigh that of the parent is reached no later than 18 months after the child has been removed from the parental home, because the maximum length of time that reunification services are provided to the parent is 18 months. (§§ 361.5, subd. (f), 366.21, subd. (f), 366.22, subd. (a), 366.26; see also In re Marilyn H., supra, 5 Cal.4th at p. 309.)
(7b) This case arose under an earlier statutory scheme that permitted significant delays in the proceedings. (See In re Marilyn H., supra, 5 Cal.4th at p. 304.) Much of the delay occurred, however, between the time that dependency proceedings concluded with a recommendation of adoption and the former Civil Code section 232 action to terminate parental rights was heard. (See In re Marilyn H., supra, 5 Cal.4th at p. 303; In re Micah S. (1988) 198 Cal. App.3d 557, 566 [243 Cal. Rptr. 756] (conc. opn. of Brauer, J.).) As to the period before the filing of the section 232 action, section 361.5 provided, as it still does, that "the juvenile court shall order the probation officer to provide child welfare services to the minor and the minor's parents ... for the purpose of facilitating reunification of the family within a maximum time period not to exceed 12 months.... Services may be extended up to an additional six months if it can be shown that the objectives of the service plan can be achieved within the extended time period." (§ 361.5, subd. (a).) Thus, although the present case is an anomaly because of various procedural peculiarities, under the dependency system applicable *421 to it, reunification services were also generally limited to 18 months, after which point "`[t]he overriding concern ... is to provide a stable, permanent home in which a child can develop a lasting emotional attachment to his or her caretakers.'" (In re Emily L. (1989) 212 Cal. App.3d 734, 741 [260 Cal. Rptr. 810], quoting In re Baby Girl D. (1989) 208 Cal. App.3d 1489, 1493-1494 [257 Cal. Rptr. 1].)
In view of the child's constitutional and statutory interest in stability (In re Marilyn H., supra, 5 Cal.4th at p. 309; In re Angelia P., supra, 28 Cal.3d at pp. 916, 919; § 366.25; In re Heather P., supra, 209 Cal. App.3d at p. 890), and the Legislature's identification of 18 months as the limitation of reunification services, we conclude that a court may find that the child's interest in stability outweighs the parent's interest in the care and custody of the child after 18 months of out-of-home placement under the pre-1989 dependency system. Accordingly, in the context of a hearing under section 388, a court after such a period of time may find that it is in the child's best interests to set aside an earlier permanency planning order on the basis of new evidence that the child will suffer long-term, serious emotional damage if a bond with foster parents is severed. (See § 366.22, subd. (a); see also §§ 366.2, subd. (e), 366.25.)
The court in In re Venita L., supra, 191 Cal. App.3d 1229, asserted that the child's loss of a bond with foster parents cannot be the basis for depriving a natural parent of custody because such a rule would make the parent's right to reunification illusory. The court, however, failed to recognize that the parent's rights to reunification services and, indeed, to the care and custody of the child, are not unlimited. The statutory scheme as to dependencies established before 1989 contemplated that reunification services normally be limited to 18 months. At the conclusion of this period, as we have explained, the parent's right to reunification may be outweighed by the child's interest in stability. At this point, evidence that disruption of the bond with foster parents will cause the child serious, long-term emotional damage may be crucial in ascertaining the best interests of the child.[3]
We recognize and condemn the unseemly conduct of the Department in this case. We are confident, however, as were the referees who presided at the permanency planning hearings, that the misconduct of the Department in making the initial placement decision did not affect the effort to reunify Jasmon with her father. Nor can it be argued that it was unnecessary to establish the dependency; it is undisputed that neither parent could care for Jasmon when these proceedings commenced, or for some extended period *422 thereafter. Therefore, no fundamental substantive due process violation appears in the Department's conduct. We do not mean to suggest by this opinion that we would overlook such a fundamental error, or that the child's bond with foster parents could be the sole factor in making a placement decision should such a fundamental error occur. Nor is this opinion intended to affect proceedings outside the dependency setting, as for example, in family law custody disputes.
We conclude that the judgment of the Court of Appeal with respect to the order pursuant to section 388 should be reversed.

3. The Former Civil Code Section 232 Proceeding

Having rejected each of the father's arguments in support of the decision of the Court of Appeal to dismiss the appeal from the termination of parental rights as moot, we reinstate that appeal. Having solicited briefing on the propriety of the order terminating parental rights, we transfer that appeal to this court and conclude that the superior court's order should be affirmed.
Former section 232 of the Civil Code provided that a child may be freed from the custody and control of his or her parents when the child has been in an out-of-home placement supervised by the juvenile court for a year, "if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child." The section also provides that: "The court shall make a determination that reasonable services have been provided or offered to the parents which were designed to aid the parents to overcome the problems which led to the deprivation or continued loss of custody and that despite the availability of these services, return of the child to the parents would be detrimental to the child." (Former Civ. Code, § 232, subd. (a)(7).)
(10a) The father argues that there is insufficient evidence to support the juvenile court's order terminating his parental rights because there was no "proper and sufficient" evidence that he had failed to maintain an adequate parental relationship, and because there was no evidence at all to support the court's determination that he was likely to fail to maintain an adequate parental relationship with Jasmon in the future or that adequate reunification services had been offered to him.
(11) A court may order termination of parental rights only if it finds the elements of the action under former Civil Code section 232 established by *423 clear and convincing evidence. (Former Civ. Code, § 232 subd. (a) (7); In re Laura F. (1983) 33 Cal.3d 826, 839 [191 Cal. Rptr. 464, 662 P.2d 922].) On review of the order of the juvenile court terminating parental rights, the reviewing court must determine whether there is any substantial evidence to support the trial court's findings. (In re Christina L. (1992) 3 Cal. App.4th 404, 414 [4 Cal. Rptr.2d 680].) It is not our function, of course, to reweigh the evidence or express our independent judgment on the issues before the trial court. (In re Laura F., supra, 33 Cal.3d at p. 833.) Rather, as a reviewing court, we view the record in the light most favorable to the judgment below and "`decide if the evidence [in support of the judgment] is reasonable, credible and of solid value  such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. [Citation.]'" (In re Christina L., supra, 3 Cal. App.4th at p. 414, quoting In re Victoria M. (1989) 207 Cal. App.3d 1317, 1326 [255 Cal. Rptr. 498], see also In re Laura F., supra, 33 Cal.3d at p. 836; In re Solomon L. (1987) 190 Cal. App.3d 1106, 1110 [236 Cal. Rptr. 2].)
(12) Former Civil Code section 232, subdivision (a)(7) requires a finding, as a prerequisite to termination of parental rights, that the parents have failed, and are likely to fail in the future, to maintain an adequate parental relationship with the child. This finding is the equivalent of a finding of unfitness, a finding that is necessary at some point in the proceedings as a matter of due process before parental rights may be terminated. (Adoption of Kelsey S., supra, 1 Cal.4th at pp. 850-851.) The superior court made the required finding, stated in the terms of the statute.
(10b) Our review of the record has convinced us that there is substantial evidence in support of the trial court's determination that the father had failed, and was likely to fail in the future, to maintain an adequate parental relationship with Jasmon. The court had before it evidence that the father had a personality disorder that prevented him from putting aside his own needs and adequately caring for this child. There was credible evidence provided by persons who had observed the father's visits with Jasmon and psychologists who had observed and worked with Jasmon that throughout the proceedings, up to the time of the hearing on termination, the father had failed to establish any parental relationship with Jasmon. Many witnesses described his interactions with her as lacking in empathy and warmth. Various psychologists and social workers were of the opinion that he saw her as a possession, simply an extension of himself. There was evidence that he was unaware of the distress that other witnesses found it obvious she was experiencing during the transition plan.
In addition, the juvenile court probation officer who prepared a report for the termination proceedings and testified at the hearing concluded that "the *424 father is no closer to having a parental relationship with his daughter today than he was in 1987." She testified that in her opinion, the father would never function adequately as a parent to Jasmon. Although the court discounted the evidence that the father was incapable of acting as an adequate parent to any child, it expressly concluded that he was incapable of meeting this child's extraordinary needs. The evidence was overwhelming that there was no parent-child relationship between Jasmon and her father, and that none had developed over these lengthy proceedings.
This past failure was predictive of the future; as we have explained, "a measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." (In re Laura F., supra, 33 Cal.3d at p. 833.) We conclude the court reasonably found, based on clear and convincing evidence, that the father had failed, and would continue to fail, to maintain an adequate parental relationship with Jasmon. (Former Civ. Code, § 232, subd. (a)(7); see also Adoption of Kelsey S., supra, 1 Cal.4th at p. 849.)
The father claims that the court found inability to be an adequate parent on the basis of circumstances that no longer existed at the time of the hearing, such as his drug dependency and early failure to comply with the reunification plan. Not so. The court noted these facts, but its comments were directed at the father's apparent failure to accept any responsibility for the fact that Jasmon had been placed in foster care in the first place. The court's finding regarding his ability to function as a parent was based on current circumstances.
(13a) As to the adequacy of the reunification services, the father claims he was not offered any services designed to overcome Jasmon's anxiety at losing her foster parents. The father argues that problems which develop during the dependency proceedings, such as the child's bonding to foster parents, cannot be the basis of continued foster care unless the department of social services has provided reunification services geared to address the new problems. He relies on In re Michael S. (1987) 188 Cal. App.3d 1448 [234 Cal. Rptr. 84] (dealing with reunification services before the permanency planning stage) and In re Venita L., supra, 191 Cal. App.3d 1229, 1242 (same).
(14) The Department was required to "make a good faith effort to develop and implement a family reunification plan ... [with] the objective of providing such services or counseling `as will lead to the resumption of a normal family relationship.'" (In re Christina L., supra, 3 Cal. App.4th at p. 414.)
(13b) We are loath to prescribe exactly what services should be offered. We observe, however, that the Department did provide services geared to *425 overcoming the problems caused by the extended dependency dispute. It was the purpose of the transition plan to overcome Jasmon's anxiety and distress at being returned to her father's custody. As for services directed at the father's ability to cope with Jasmon's special needs, the effectiveness of such services was limited by the father's failure to admit that his child was suffering any distress during the transition plan and to cooperate with the psychologist who was administering the plan. The evidence shows that during the reunification period as well as during the period of the transition plan, the father denied that Jasmon had any special needs or suffered any particular anxiety about losing her foster parents. The father was provided with a psychologist (in fact, a series of psychologists) whose primary task was to help him meet the challenge of becoming a parent to Jasmon. This counseling extended from the beginning of the reunification plan through the transition plan. None of the psychologists who testified, including the father's therapist, had any criticism of the transition plan. There was evidence that the father became so suspicious of the psychologist supervising the plan and treating his daughter that he refused to meet with him to discuss Jasmon's increasing anxiety. During the entire proceedings, the father was offered, and, indeed, took advantage of, multiple services, including, as we have noted, psychological counseling, parenting classes, and drug rehabilitation services. The services offered were reasonable under the circumstances. (In re Christina L., supra, 3 Cal. App.4th at p. 417 [reasonable, not ideal, services required].)
As we have noted, in an action to terminate parental rights under former Civil Code section 232, the court must determine not only whether the parent has failed, and is likely to continue to fail, to maintain an adequate parental relationship, but also whether return of the child to the parent would be "detrimental" to the child. (Former Civ. Code, § 232, subd. (a)(7); In re Brittany H. (1988) 198 Cal. App.3d 533, 551 [243 Cal. Rptr. 763].)
The father does not suggest that there was insufficient evidence of detriment to support the court's determination apart from the claim that a child's bond with the foster parents cannot be the sole basis for such a determination. (15) Even more than at the permanency planning stage, at the point that the court is to hear a subsequent action for termination of parental rights, it is clear that the court may find that the child's interest in stability outweighs the parent's interest in the care and custody of the child. At this late point, as we have said, reunification efforts have ceased and the state's purpose is no longer reunification, but to free the child for adoption or other permanent, out-of-home placement. (See In re Emily L., supra, 212 Cal. App.3d at p. 741; In re Shannon W., supra, 69 Cal. App.3d at pp. 961-962; see also In re Laura F., supra, 33 Cal.3d at p. 837.) The primary *426 focus is to assure the best interests of the child. (Former Civ. Code, §§ 232, subd. (b), 232.5, 232.6; In re Laura F., supra, 33 Cal.3d at p. 837; In re Jonathan R., supra, 211 Cal. App.3d at p. 1221; In re Solomon L., supra, 190 Cal. App.3d at p. 1112.) Accordingly, at a hearing on termination of parental rights, the court may rely on evidence that the disruption of the child's bond with foster parents will cause the child serious, long-term emotional damage in determining whether, in the terms of the statute, it would be detrimental to return the child to the natural parent. (See In re Brittany H., supra, 198 Cal. App.3d at p. 552 [detrimental to return child to natural parent after four years with foster parents]; see also In re B.J.B. (1985) 185 Cal. App.3d 1201, 1209 [230 Cal. Rptr. 332] [detriment may be established by proof of bonding with foster parents].) In addition, we note that the court did have before it evidence that the detriment to Jasmon in returning to her father's care would arise not only because of the disruption of her bond with the foster parents, but also because of the father's unfitness to meet her extraordinary needs.
(16) The father argues finally that we have required that the decision to terminate parental rights must be supported by evidence that severing the parental relationship is the least detrimental alternative available. (See In re Carmaleta B. (1978) 21 Cal.3d 482, 489 [146 Cal. Rptr. 623, 579 P.2d 514]; see also In re Micah S., supra, 198 Cal. App.3d at pp. 560-561; In re Solomon L., supra, 190 Cal. App.3d at p. 1114.) He argues the trial court failed to make a necessary determination that termination of parental rights was the least detrimental alternative for him.
The father's argument elevates the desires of the parent over the welfare of the child, but the law focuses more on the interests of the child at this late stage of the proceedings  here nearly seven years after placement with the foster parents. (Former Civ. Code, §§ 232, subd. (b), 232.5, 232.6; In re Laura F., supra, 33 Cal.3d at p. 837; In re B.G. (1974) 11 Cal.3d 679, 698 [114 Cal. Rptr. 444, 523 P.2d 244]; In re Jonathan R., supra, 211 Cal. App.3d at p. 1221, In re Micah S., supra, 198 Cal. App.3d at pp. 565-566 (conc. opn. of Brauer, J.); In re Solomon L., supra, 190 Cal. App.3d at p. 1114; In re Rico W. (1986) 179 Cal. App.3d 1169, 1176 [225 Cal. Rptr. 472].) As we said in In re Carmaleta B., supra, 21 Cal.3d 482, on review of the termination hearing, "we must determine if the trial court's findings ... were supported by substantial evidence such that the situation contemplated by the statute [section 232] arises, and severing the parental relationship becomes the least detrimental alternative for the children." (Id. at p. 489, italics added; see also former Civ. Code, § 4600, subd. (c), now Fam. Code, § 3041.) As one court has explained in responding to a similar argument: "Obviously, any alternative short of termination is less drastic to parental rights. While preservation of [the mother's] rights are an important consideration, once again, the focus *427 of the court's inquiry is upon the welfare of the child. (Civ. Code, § 232, subd. (b).)" (In re Solomon L., supra, 190 Cal. App.3d at p. 1114.) Certainly, it is a weighty matter to decide whether a parent should be separated forever from a child, and the desire of the parent to achieve a family relationship is given consideration. (See, e.g., In re Victoria M., supra, 207 Cal. App.3d 1317, 1331; see also Adoption of Kelsey S., supra, 1 Cal.4th at p. 849.) But the court at the hearing under former section 232 was required to focus on selecting the alternative that was least detrimental to the child.
(17) In the present case, the trial court did not make a specific finding that termination was the least detrimental alternative. An express finding is not required. (In re Rico W., supra, 179 Cal. App.3d at p. 1176.) It is clear that the court in this case considered the alternatives presented through the testimony of witnesses and the admission of written reports into evidence, and concluded that termination of parental rights was the least detrimental alternative for the child. The court stated that although it might be too late to preserve Jasmon's psychological health completely, the court would not make any orders that would create further anxiety or emotional problems for her, or further impair her psychological health. The court clearly considered the father's desire to achieve a parent-child relationship. However, there was substantial evidence before the court that guardianship or long-term foster care would be detrimental to Jasmon because the child derived no benefit from any relationship with her natural father and because the uncertainty of her position would be prolonged indefinitely as long as the natural father could continue to litigate issues relating to custody and visitation. It was obvious from the father's understandable assiduity in litigating every possible issue in this case that he would continue to do so if his parental rights were not terminated.
At the time of the hearing on termination of parental rights, Jasmon's future had been uncertain for a period of years. It was clear that further reunification services would be fruitless. Jasmon had suffered severely in the tug of war between her natural father, the Department, the foster family, and the courts. To permit this uncertainty to continue, even in the shape of disputes over visitation in the context of a guardianship or long-term foster care arrangement, would be inconsistent with the state's and the child's interest in avoiding further detriment to Jasmon. (See In re Angelia P., supra, 28 Cal.3d at p. 923; In re Jonathan R., supra, 211 Cal. App.3d at p. 1222.) The conclusion of the trial court that termination of parental rights and adoption were the least detrimental alternatives for Jasmon was supported by substantial evidence.
Accordingly, we conclude that the judgment of the superior court terminating the father's parental rights should be affirmed.
*428 The father argues that we still must reach certain issues he raised in the Court of Appeal with respect to the propriety of the juvenile court referee's orders at the final permanency planning hearing. The Court of Appeal did not reach these issues, apparently because it believed its reversal of the section 388 order rendered the new permanent plan a nullity and reinstated the earlier permanent plan directing that Jasmon's custody be returned to her father.
We decline to reach these issues. Although the father claims that most of these errors affected the termination proceeding, he does not specify the issues to which he is referring, nor does he explain why they would have affected the termination proceeding. Nor do we see any way in which his claims would affect the latter determination. Thus, for example, the claim that the juvenile court referee erred in ordering the father to testify regarding his efforts at publicizing the case and to turn over his copies of Department reports and other notes would have no impact on the superior court's later de novo determination of the issue of termination of parental rights. Nor would his claims of error in admitting evidence affect the former Civil Code section 232 proceeding, as the evidence to which he objected was clearly not the sole basis for the superior court's decision, and, in fact, some of the testimony was presented again at the section 232 proceeding, and he does not suggest on appeal from the judgment in the section 232 proceeding that the admission of this evidence was error. His claims that the juvenile court referee should have selected the least detrimental alternative, namely, modification of the transition plan, and that the referee erred in determining that the child would not benefit from a relationship with her father are superseded by the judgment of the superior court that return of the child to her father would be detrimental. His claims with respect to form and notice of the section 388 motion would not affect the section 232 judgment because the success of the section 388 motion was not a procedural predicate to the filing of the section 232 action. He attacks as unconstitutional the referee's order that the Department file an action pursuant to section 232, maintaining that the Department's misconduct should vitiate the order. However, the juvenile court referee's order would not affect the superior court's determination, as the superior court considered the same evidence of misconduct and necessarily rejected it as a basis for a decision not to terminate parental rights. In such circumstances, it is clear that the order terminating parental rights renders the father's claims with respect to the earlier hearing moot. (In re Kristin B., supra, 187 Cal. App.3d at pp. 604-605.)
Finally, we reject the argument of the dissent that because the Department caused the child to be placed in a foster home, created the child's bonds to the foster parents, and disrupted the child's potential bond with the father, it *429 would be fundamentally unfair to terminate the father's parental rights even if it would be detrimental to the child to be returned to his care.
The factual assumptions of the dissent are incorrect. It was not the Department, but the child's parents who made it necessary to place the child in foster care and to keep her there. The father is far from being the innocent victim portrayed by the dissent. At age 24 he chose to enter into a sexual relationship with Jasmon's mother, who was then an emotionally troubled minor of 16, living in a halfway house for the mentally disturbed. The father admitted these facts under a promise by the court that they would not be used against him in any other proceeding, e.g., a statutory rape charge. When the child was born, the father had a 10-year history of drug and alcohol abuse, and had been hospitalized for mental illness. He had been living in an "independent living center" for the mentally ill for a year and a half when he entered the liaison with the child's mother. He lived with the child and mother outside of the halfway house until Jasmon was four or five months old, but then he left. His excuse for leaving his family was that the child's mother would not "settle down." When Jasmon's mother brought the child to the Department, unable to care for her alone, the father was again in a half-way house for the mentally ill and had problems with drugs.
The Department was also not to blame for the fact that the child had to stay in foster care for an extended period. As the superior court declared in its findings in support of the termination order, "Mr. O[ ] did not jump into the reunification plan with both feet. There was a passage of almost 18 months before he could  it could even be reasonably said that compliance was had." The court noted that even the father's expert placed the "responsibility on Mr. O[ ] for having used the drugs and the medications and the alcohol such as to create apparent personality disorders and a state in which he was unable to take care of the minor during the initial period." Again, the court declared that because of the father's inability to care for the child, "[t]here was a period of almost 18 months or more when it would have been completely unreasonable to have even considered any kind of reunification." During this 18-month period, it was natural that the child would bond with the A.'s, but this bonding occurred because of the father's inability to be a parent  not because of any improper acts of the Department or the A.'s.
The dissent claims there is insufficient evidence to support the finding that the father could not provide adequate parental care for Jasmon. It suggests we have simply accepted the prevarications of the Department in reaching a contrary conclusion. We do not, however, uncritically accept the claims of the Department regarding the father; rather, we find that substantial evidence supports the determination of the judicial fact finder in this case, a fact *430 finder that received evidence, observed the demeanor of the witnesses, and concluded that parental rights should be terminated.
Many judicial officers have reviewed the facts in this exhaustively litigated case  a case which the dissent would remand for further seemingly endless litigation. Only one referee, with reluctance, concluded that the father might possibly perform adequately as a parent. The others disagreed. The juvenile court at the final 1991 hearing made a finding that he could not perform adequately as a parent, declaring the evidence to be "overwhelming." The superior court that ordered termination of parental rights also expressly determined that the father could not perform adequately as a parent.
The dissent dismisses much of the evidence relied upon by the superior court as insubstantial because it was offered through the testimony of psychologists. In addition to the evidence already referred to, such evidence included the declaration of the psychologist treating the father near the time of the termination hearing that he no longer believed that the father was able to take on the responsibility of being a parent and that the father was unable to recognize the child's needs. It also included evidence of an independent psychologist that the father had a narcissistic personality disorder. Without the testimony of psychologists, in many juvenile dependency and child custody cases superior courts and juvenile courts would have little or no evidence, and would be reduced to arbitrary decisions based upon the emotional response of the court. It cannot seriously be argued that such evidence should be excluded, or denied substantial weight.
Further, there was other evidence of the father's incapacity in this case, including testimony of observers who noted the father's strange inability to relate to the child. The child's biological mother was of the opinion that the father was totally unfit to be a parent. Finally, the father himself unwittingly provided evidence in support of the superior court's decision, demonstrating a total lack of understanding of his child's predicament.
The dissent criticizes the Department and to some extent the A.'s for taking the child from her family, preventing reunification with the father, and trying to secure an adoption. The father's attorney at the termination hearing, however, told the court that he was making no argument that the foster parents had interfered with reunification. He told the court that it was not his position that the Department had sinister motivations  he claimed that the Department had been stupid rather than malevolent. The record does not support any conspiracy theory. There was a conflict of interest when the mother's social worker found that the mother had brought the child to the *431 Department, and the social worker recommended to the Department's placement worker that the child be placed with the social worker's sister. Contrary to the assertion of the dissent, she did disclose to the placement worker that it was her sister, but the Department failed to inform the court or the parents of this fact.
The first referee to consider this evidence concluded that neither the foster parents nor the social worker had any "hidden agenda" and that both were actually well motivated. "I find no evidence of any evil motive, plan, scheme or design from the standpoint of interfering with either mother's or father's rights." The referee at a subsequent hearing, at which the father raised the issue again, concluded: "The court finds that, while initially there may have been the appearance of improprieties early in the case, there was no act of collusion by Social Worker Reid or the foster parents to thwart reunification efforts. The foster parents have bent over backwards to assist in the reunification services." Mrs. A. testified that she scrupulously abided by the rules and regulations of the foster family manual of policies and procedures. It was stipulated that very early in the placement she developed the hope that the child would not be reunified with the father, but that she did not believe she had interfered with the reunification, but in fact believed she had done her utmost to assist in the reunification. Mr. A. testified that he and his wife both did everything in their power to support the reunification effort. The probation officer  not a Department employee  testified that she did not believe the foster parents tried in any way to thwart reunification with the father. The superior court expressly found no evidence that the foster parents had interfered with reunification.
The child was placed in foster care at age six months because both parents were totally unable to care for her. She is now seven and a half years old. The determination of the superior court is supported by substantial evidence and this litigation should come to an end.

IV. CONCLUSION
We conclude that sufficient evidence supports the trial court's decision to terminate the father's parental rights. Because we reach this conclusion we need not reach other arguments of the minor and the Department in support of the trial court's judgment.
The judgment of the Court of Appeal in D014729 is reversed. The order of the Court of Appeal in D015741 dismissing the appeal from the judgment in the proceeding pursuant to former Civil Code section 232 is reversed. The appeal is reinstated and transferred to this court, and the judgment of the superior court is affirmed.
Lucas, C.J., Arabian, J., George, J., and Werdegar, J., concurred.
*432 BAXTER, J.
I respectfully dissent from the majority's disposition and part of its reasoning. I share the majority's sympathy toward this child, whose young life has been subject to much travail and uncertainty. As the majority acknowledges, however, the child's father has a federal constitutional right not to have his parental relationship terminated without a clear and convincing showing of his unfitness. Although reasonable minds might differ, I am not persuaded there has been such a showing.
The very harm the majority seeks to avoid, a separation from the child's foster parents, is largely the result of wrongdoing and misfeasance by the San Diego County Department of Social Services (the Department). Nevertheless, the majority uncritically accepts every assertion of the Department in concluding that a return of the child to her father will be irreparably detrimental and that her father is unfit. In light of the Department's misconduct to date, I am reluctant to be so trusting. Indeed, the majority does not consider that a termination of parental rights can itself be detrimental to a child. The severance of that relationship is permanent and very well may cause serious emotional problems later in the child's life. The majority's visceral attempt to do good may ultimately prove to be devastating to Jasmon.
The majority's resolution of this case also raises the compelling federal substantive due process question of the limits beyond which a state may not define unfitness. In light of his epic struggle thus far to retain his parental relationship, I expect the father will ask the United States Supreme Court to review this court's decision. I believe the high court should do so to remove the future doubt and harm that the majority's decision may perpetuate.

1. The proper legal standard for termination of parental rights

The majority correctly states that a finding of parental unfitness is a constitutionally compelled predicate to termination of parental rights. (Maj. opn., ante, at pp. 422-423.) We have previously made this rule clear. (Adoption of Kelsey S. (1992) 1 Cal.4th 816, 850-851 [4 Cal. Rptr.2d 615, 823 P.2d 1216].) The majority, however, casts needless doubt on this rule when the majority subsequently states that, "[A]t the point that the court is to hear a subsequent action for termination of parental rights, it is clear that the court may find that the child's interest in stability outweighs the parent's interest in the care and custody of the child." (Maj. opn., ante, at p. 425.) This statement suggests that a finding of parental unfitness is not required and that termination is to be determined by the child's best interests. This creates an inconsistency in the majority opinion. It is also wrong.
We have made clear that a parent's rights cannot be terminated absent a showing of unfitness. (Adoption of Kelsey S., supra, 1 Cal.4th 816, 850-851 *433 [Kelsey S.].) A showing of a child's best interest alone is not sufficient. (Id., at p. 846.)[1]"`Until the state has established parental unfitness it cannot assume that the interests of the child and his or her parents diverge and until such time parent and child share an interest in preventing an erroneous termination of the relationship.'" (Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 251 [19 Cal. Rptr.2d 698, 851 P.2d 1307], quoting In re Heather B. (1992) 9 Cal. App.4th 535 [11 Cal. Rptr.2d 891], italics added.)
The United States Supreme Court appears to have held likewise. In Kelsey S., supra, 1 Cal.4th 816, we discussed in detail and relied on several high court decisions in reaching our conclusion that a particularized finding of unfitness was required. For example, in Stanley v. Illinois (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208], the court explained, "What is the state interest in separating children from fathers without a hearing designed to determine whether the father is unfit in a particular disputed case? We observe that the State registers no gain towards its declared goals [of protecting the child's best interest] when it separates children from the custody of fit parents. Indeed, if Stanley is a fit father, the State spites its own articulated goals when it needlessly separates him from his family." (Id., at pp. 652-653 [31 L.Ed.2d at p. 559], italics added.) The high court subsequently reiterated the need for a "particularized finding that the father was an unfit parent." (Quilloin v. Walcott (1978) 434 U.S. 246, 247-248 [54 L.Ed.2d 511, 515, 98 S.Ct. 549], italics added.)
As another state's high court aptly observed in a difficult case, "As tempting as it is to resolve this highly emotional issue with one's heart, we do not have the unbridled discretion of a Solomon. Ours is a system of law, and adoptions are solely creatures of statute.... [W]ithout established procedures to guide courts in such matters, they would `be engaged in uncontrolled social engineering.' This is not permitted under our law; *434 `[c]ourts are not free to take children from parents simply by deciding another home offers more advantages.'" (In Interest of B.G.C. (Iowa 1992) 496 N.W.2d 239, 241.)
I believe the majority should eliminate its internal inconsistency regarding whether a finding of parental unfitness is constitutionally required.

2. Application of the proper standard to the facts of this case

Civil Code former section 232, subdivision (a)(7) (now Fam. Code, § 7828, subd. (a)(2)) requires two independent showings: (1) detriment to the child; and (2) a failure "to maintain an adequate parental relationship," i.e., parental unfitness.
I am not persuaded by the majority's treatment of either standard in this case. Before addressing them, though, I note that the two conditions  detriment and unfitness  are not the same. The cases holding that an unfitness finding is a constitutional requirement make that point clear. Logic does so as well. A child could be taken from a blameless and perfectly fit parent by the Department based on a false accusation of wrongdoing, for example, molestation. By the time such a case is resolved, the delay and the Department's handling of it might ensure detriment to the child if she is returned to her parent. But surely, we would not allow termination of the parent's rights in such a case.

A. Detriment

The evidence of detriment was all of one type: that Jasmon would suffer greatly if her bond with the foster parents was severed. That conclusion may very well be factually correct, but it flows from a faulty legal premise and should be viewed with suspicion. The bonding on which the trial court relied was partly the result of improper conduct by the Department and perhaps the foster parents as well. The Department manipulated the situation to create the very circumstance on which it now relies.
This story begins with Debra Reid (Reid), a social worker for the Department. One of her clients was Debra N. (Debra), who had been declared a dependent child. Debra became pregnant by Gavin O. (Gavin) in 1986 and petitioned the juvenile court to terminate its jurisdiction over her. Reid opposed the petition for reasons that would later become apparent, but the court granted it nevertheless.
Reid's sister and brother-in-law, Lise A. and Robert A. (the A.'s), were childless. During Debra's pregnancy, Reid repeatedly discussed with her sister Lise the prospect of the A.'s adopting the child.
*435 Six months after Jasmon was born, the Department successfully petitioned to have Jasmon declared a dependent child. The court ordered her placed in a licensed foster home. She was placed in one only briefly, for six days. After the dependency proceeding began, Reid urged other members of the Department to place Jasmon in her sister's home. As a result of Reid's successful manipulation of the system, the Department violated the court order by removing Jasmon from the licensed home and placing her in the A.'s home, which was not licensed until more than two months later. Perhaps due to more input from Reid, the A.'s home was licensed in violation of the Department's rules because a placement worker did not visit the home before issuing the certificate. The Department concealed all this from the court.
Jasmon's case was assigned to Department social worker Laura Ross, who was an acquaintance of the A.'s. To her great credit, Ross recognized the conflict of interest, removed herself from the case, and reported the matter to her supervisor. In belated response to this information, the Department claims to have sent a letter of reprimand to Reid but did not inform the court of the problem with Reid's and the A.'s involvement. Nor did the Department remove Jasmon from the A.'s home even though she had been there only 10 days when the Department learned of the relationship between Reid and the A.'s.
Lise A. commendably made clear from the outset that she was interested in adopting Jasmon, thus highlighting the inherent conflict in selecting the A.'s as foster parents. Though the Department was aware of this problem, the Department did nothing and withheld this information from the court. Indeed, the Department repeatedly represented to the juvenile court that the A.'s goal was to facilitate reunification, not adoption.
The foregoing history strongly suggests Jasmon's proceeding was manipulated by Reid and the Department from the very beginning to ensure that parental rights would be terminated so that the A.'s could adopt Jasmon.
The plot continued. A reunification plan was prescribed, and as the Court of Appeal explained, "It is undisputed from this record and from the findings of the court that Gavin completed all the reunification services required by DSS." (Italics added.) The Department nevertheless "continually sought to have the court order adoption as the permanent plan for Jasmon." The Court of Appeal refused and ordered reunification to proceed without undue delay. "Nevertheless, at every hearing during which the court ordered visitation and expected such visitation to occur, DSS did not comply with the visitation as ordered. DSS never obtained orders from the court curtailing visitation, and *436 only informed the court at the next hearing set by the court that visitation had not occurred for various reasons...."
In light of this history, it seems almost inescapable that the Department and the A.'s sought to form the strongest possible relationship between the A.'s and Jasmon, a relationship that would ensure trauma to Jasmon if she were reunited with her father. The A.'s actions in providing a comfortable and safe home for Jasmon were understandable, even commendable up to a point. No one benefits from bad foster parents. A couple in the A.'s position, however, can hardly be expected to be sensitive to the biological parents' interest in reunification. The process is regrettably and undeniably a zero-sum contest. The child is the prize. One contestant wins; one contestant loses. Anytime a dependent child is placed with foster parents who wish to adopt the child, there is an inherent conflict of interest between the prospect of adoption and that of reunification. Like the A.'s, the foster parents will want to form the strongest and earliest possible bond with the child. A recent San Diego County Grand Jury report, which criticized the Department and its handling of this case, specifically recommended against "placing any child in a `foster-adopt-home while there is a reunification plan still in place.'" (San Diego County Grand Jury, Families In Crisis (Feb. 6, 1992) p. 15, original italics [hereafter the Grand Jury Report].) This case proves the point. From the moment of her placement with the A.'s, Jasmon's future was largely preordained.
These circumstances, including the outright misconduct by the Department, should also cause us to be most skeptical of any assertion by the Department, including its factual assertion that Jasmon would suffer extreme detriment under any circumstances surrounding a return to her father. A similar concern arises as to the so-called psychological experts who testified for the Department. As Justice Brennan pointed out, some studies show that social workers tend to have an inherent hostility to biological parents. (Smith v. Organization of Foster Families (1977) 431 U.S. 816, 834-835 [53 L.Ed.2d 14, 28-29, 97 S.Ct. 2094].) The Grand Jury Report explained how this problem even taints the workers' opinions. "Every client, parent or child, in Juvenile Court appears to have a court ordered therapist.... The court employs therapists from an approved list. Therapists from the court approved list have testified before the Jury that they fear removal from that list if they oppose the recommendations of the Department. Therapists testified that social workers frequently distort reports they have been given about patients. Therapists told Jurors that, as long as they are in agreement with the social worker, their reports are given great weight. On the other hand, if they disagree with the social worker, their recommendations may not even appear in the report to the court. Further, therapists said that if they *437 disagree with the social worker they may never see their patient again." (Grand Jury Report, supra, pp. 36-37.) This case seems to bear out the problem. Moreover, the psychological "evidence" used to justify the Department's view was nothing more than an intuitive and entirely unoriginal notion that a child will be upset if separated from her known parents (foster, in this case).
The majority attempts to justify its conclusion by referring to the findings of the referees in this case. (Maj. opn., ante, at p. 431.) I am not persuaded. The referees did not, in my view, sufficiently take into account, if at all, the fact that the bonding was in large part the result of the Department's mishandling of the case and the A.'s calculated attempt to bond as fully as possible with Jasmon.

B. Parental unfitness

Even if the trial court's finding of detriment could properly be based on misconduct by the Department and persons other than the father, there remains the statutory and constitutionally compelled question of whether the father was unfit, or, as Civil Code former section 232, subdivision (a)(7) put it, whether he failed, and was likely "to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child." (See now Fam. Code, § 7828, subd. (a)(2).) I conclude the trial court's finding of such a failure was not supported by the required clear and convincing evidence.
The court declined to find that the father was incapable of being a fit parent to any child, just that, as the majority phrases it, "he was incapable of meeting this child's extraordinary needs." (Maj. opn., ante, at p. 424, italics added.) I do not dispute that the finding of unfitness should be based on the circumstances of the particular parent and child rather than on some abstract ability to parent. In this case, however, the finding's premise bears the same flaws that infected the finding of detriment.
Jasmon's alleged extraordinary needs were the result in large part of: (1) the strong bonding with the A.'s that had developed; and (2) the protracted dependency proceedings, including the attempted transition back to the father. As explained above, the bonding was itself at least partly the result of improper conduct and an inherent conflict of interest. Likewise, the transition difficulties to a significant extent either were caused or exacerbated by the Department and the A.'s. Thus, the situation was that Jasmon's "extraordinary needs" were the result of problems not caused by the father. The finding of unfitness (assuming that was the finding) was a bootstrap proposition; that is, the Department caused problems and then contended the father *438 was unfit to deal with those problems. Under this misguided approach, the Department could take a child from parents who have done absolutely nothing wrong. By the time the parents prove their innocence their child may very well have suffered severe emotional problems. The Department could then argue that the parents are not capable of salving the wounds inflicted by the Department.
Even if the finding were not bootstrapped, it would be suspect. None of the customary charges of unfitness are leveled against the father. Indeed, the majority admits he achieved a heroic turnaround of his life and resolved the problems that led to the dependency proceedings. The trial court found not a single deficiency in any of the traditional measures of being a fit parent, for example, "providing both a home and care ... for the child." (Civ. Code, former § 232, subd. (a)(7); see now Fam. Code, § 7828, subd. (a)(2).) Being unable to point to any real shortcoming, the majority, like the trial court, relies solely on psychological evidence about perceived deficiencies in the father's empathy for Jasmon's alleged difficulties in being returned to his custody.
Put bluntly, this is worse than flimsy. Under this radical new standard, any parent who is not sufficiently sensitive in a way that pleases Department-paid therapists will risk being found unfit. This is the Orwellian new rule: If a therapist thinks a parent should be more loving and demonstratively affectionate, the parent loses the child  period and forever. Life might be wonderful if every parent were ideal in every respect, but that is not and never has been reality. Failure to be fully empathetic  whatever that may mean, if it means anything  is almost certainly a failing common to many parents, including many upstanding members of the community. Indeed, a cottage industry has arisen in which the offspring of the powerful or famous publish accounts of their emotionally unfulfilled childhoods. But have we taken away these children? Of course not. But now, if Daddy is perfect in all respects, except that he is a bit too Victorian  stiff, that is  he will be at risk of being adjudicated an unfit parent.
Finally, the testimony against Gavin repeatedly compared him to the A.'s. This is not a beauty contest. Unfitness has not previously been based on comparing competing families. The A.'s were older, more financially secure, and were a couple rather than a single parent. (One psychologist explicitly faulted the father for being single.) This is contrary to our national tradition that even parents of the humblest origins can be wonderful parents, rearing children that achieve great success, even becoming Presidents. How different would our history be, how different would this court be, if humble beginnings were a ground for parental termination. Termination should not be *439 based on the fact that the prospective adoptive parents have superior resources or an easier life than the biological parent. (Kelsey S., supra, 1 Cal.4th 816, 846.)
In short, I conclude the trial court's finding of unfitness is not supported by clear and convincing evidence. The evidence is suspicious but, even if true, does not show unfitness under Civil Code former section 232, subdivision (a)(7). That statute, which governs this case, explicitly requires clear and convincing evidence of unfitness. (Cynthia D. v. Superior Court, supra, 5 Cal.4th 242, 252-253.) I do not believe the evidence in this case meets that high standard.
Most important, the evidence cannot reasonably be said to show unfitness of a type that satisfies federal constitutional due process. The majority admits that the rights of a parent to the custody, control, and companionship of his or her child are a fundamental interest under the federal Constitution. (Maj. opn., ante, at p. 419.) The parent's rights are protected by the due process clause of the Fourteenth Amendment to the United States Constitution. Any law eliminating the parent's rights therefore must be subjected to strict scrutiny as a matter of substantive due process. (2 Rotunda & Nowak, Treatise on Constitutional Law (2d ed. 1992) § 17.4(c), pp. 614-619.)
The majority's decision erodes any meaningful constitutional protection afforded a parent under threat of losing a child through a parental termination proceeding. To water down the finding of unfitness is to violate the parent's substantive due process rights. Could a state say that a parent is unfit if found to be too poor, too uneducated, or otherwise lacking in some characteristic the state deems desirable or having some trait the state does not like? Surely, the concept of unfitness has constitutional boundaries or the requirement of a showing of unfitness means nothing. "The [high] Court has on several occasions granted review to cases involving substantive due process and equal protection questions concerning a state's ability to define the basis upon which parents are deemed unfit and their parental rights terminated." (2 Rotunda & Nowak, Treatise on Constitutional Law, supra, § 17.4(c), p. 616, fn. 47.) For various reasons, though, the court has "avoided ruling on [those] issues." (Ibid.; see Moore v. Sims (1979) 442 U.S. 415 [60 L.Ed.2d 994, 99 S.Ct. 2371]; Doe v. Delaware (1981) 450 U.S. 382 [67 L.Ed.2d 312, 101 S.Ct. 1495].) Thus, the boundaries of the unfitness requirement are not clear. Nevertheless, the constitutionally required predicate of unfitness must mean something more than merely a showing that the parent is not as affectionate and loving as would be expected of a model *440 parent. I therefore conclude the finding of unfitness is not only factually suspect but also violates the father's right to federal substantive due process.
Kennard, J., concurred.
Appellant's petition for a rehearing was denied October 27, 1994. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.
NOTES
[1] Former Civil Code section 232 provided for a superior court action to terminate parental rights. In 1989 the dependency law was amended to provide that the hearing on termination of parental rights would occur in the juvenile court pursuant to standards now set out in Welfare and Institutions Code section 366.26. As to cases like this one in which dependency was established before January 1, 1989, the provisions of former Civil Code section 232 (now Fam. Code, §§ 7802, 7808, 7820-7829) continue to apply.
[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[3] To the extent In re Venita L., supra, 191 Cal. App.3d 1229, is inconsistent with this opinion, it is disapproved.
[1] The question in Kelsey S., supra, 1 Cal.4th 816, was whether the biological father of a child born out of wedlock, a father who was not a statutory presumed father, could be denied the right to withhold his consent to his child's adoption by third parties despite his diligent and legal attempts to obtain custody of his child and to rear it. We held that "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities  emotional, financial, and otherwise  his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (Id., at p. 849.) In other words, under Kelsey S., the threshold determination was whether the biological father had demonstrated a sufficient commitment to being a parent. Only if he made that showing was he to be treated like a presumed father and thus be entitled to a showing by the state of his unfitness before his parental rights could be terminated. (Id., at p. 850.) The Department correctly refers to Jasmon's biological father as being a presumed father because it is undisputed that he received Jasmon into his home and held her out as his child. Thus, because he was in fact a presumed father, the question of whether he was entitled under Kelsey S. to be accorded the same treatment as a presumed father is not an issue.