Filed 7/1/14  In re M.L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re M.L. et al., Persons Coming Under the Juvenile Court Law. | |
| | D065168 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518395 A-C) |
| v. | |
| JESSICA C., | |
| Defendant and Appellant. | |


APPEAL from orders of the Superior Court of San Diego County, Elizabeth A. Riggs, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Patrice Plattner-Grainger, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Brittany Murphy, under appointment by the Court of Appeal for Minors.

Jessica C. appeals orders of the juvenile court granting petitions under Welfare and Institutions Code[1] section 388 placing her children with their father, A.L. Jessica contends the juvenile court abused its discretion in granting the petition because the children were doing well in her care and A.L. had "serious unresolved domestic violence issues." We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Jessica and A.L. married in 2002. Their first son, M.L., was born in 2003 while they were living in Georgia. They separated in early 2004 and Jessica moved with M.L. to San Diego, where she had family. After his honorable discharge from the military, A.L. moved to Kern County. The couple had another son, M.C., together in 2005, but divorced in 2006, with joint legal and physical custody of the boys.

Between February 2004 and mid-2008, the family had a number of child welfare referrals, several of which were based on Jessica's allegations that A.L. had been violent with her and the children. None of the referrals resulted in conclusive findings and several were deemed to be unfounded.[3] A.L. was never arrested or charged with any crimes arising from the underlying allegations. Jessica and A.L. had a third child, a daughter, in 2010.

From 2008 to 2011, Jessica moved with the children several times between San Diego and Los Angeles or Kern County, where A.L. was living. In March 2011, when she and the children were staying at the St. Vincent de Paul Village in San Diego, the San

_____

[1]    All further statutory references are to the Welfare and Institutions Code.
[2]    As can be seen from a comparison of the factual recitation that follows and the facts set forth in the opening brief, Jessica has failed to comply with a fundamental rule of appellate procedure requiring that the evidence be construed most favorably to the challenged order. (See generally *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247.)

[3]    When later asked about the referrals, Jessica responded that she called in some of them herself after A.L. did not return the children to her at the agreed-upon time.

Diego County Health and Human Services Agency (the Agency) opened a voluntary services case for her, but closed the matter a few months later based on its inability to locate the family. At about the same time it closed the case, the Agency received a report from Jessica's sister, Carmen, that Jessica was unstable, had been physically aggressive with her, and was not getting the boys to school.

In December 2011, when she and the children were in Lancaster, Jessica called a domestic violence shelter alleging that A.L. had assaulted her and M.L. when the family was shopping together.[4] Jessica and the children moved into a Los Angeles shelter and the Los Angeles Department of Children and Family Services (DCFS) devised a safety plan for the family and filed dependency petitions for the children, seeking their removal from A.L.[5]

Jessica took the children and left the shelter without notifying DCFS, and the court issued an arrest warrant for her and protective custody warrants for the children. When DCFS discovered Jessica and the children had returned to San Diego and were living with Carmen and her husband, Jessica was arrested on the outstanding warrant and the children were placed in foster care. She was later released and moved back in with Carmen.

In January 2012, the Los Angeles County Superior Court issued a restraining order against A.L. for Jessica's protection and, over DCFS's objection, ordered the children

_____

[4]    Jessica also alleged that four months earlier, A.L. had forcibly taken her and the children from San Diego to Lancaster and essentially held them prisoner in his home, but law enforcement refused to take any action after she reported it. A.L. denied Jessica's allegations, stating she asserted them after he declined to buy her a sweater she wanted.

[5]    The petitions alleged that the children were in need of the protection of the juvenile court because A.L. used inappropriate physical discipline and engaged in rough horseplay with the children, and the parents had a history of domestic violence. A.L. consistently denied physically abusing Jessica or the children. Most of the petition's allegations of physical abuse relating to the children were later dismissed.

3

placed with Jessica. Based on reports that Carmen had a criminal history and her husband had prior substantiated child protective service referrals, the court instructed DCFS to find a domestic violence shelter for Jessica and the children.

In March 2012, the juvenile court in Los Angeles sustained the petitions, declared the children dependents and continued their placement with Jessica. It ordered domestic violence counseling, parent education, and individual counseling for Jessica; individual domestic violence counseling for A.L; and individual therapy for the boys. It also authorized supervised visitation between A.L. and the children.

While Jessica and the children were in the domestic violence shelter, the boys were enrolled in school, which evaluated M.L. for an Individualized Education Program (IEP).[6] In April 2012, the dependency proceedings were transferred from Los Angeles to San Diego, over A.L.'s objection. Although A.L. was living in Mojave and employed full-time, he maintained regular supervised weekend visits with the children in San Diego.

Meanwhile, Jessica continued to struggle to maintain stable housing.[7] She voluntarily left the domestic violence shelter where she had been staying, and she and the children were asked to leave a second shelter after a week because of an incident between Jessica and another resident. The family lived in a third shelter for two weeks in late May 2012, but moved back in with Carmen on June 1. In early August 2012, Carmen, Jessica and the children moved to another home together, although Jessica frequently threatened to move out because of her ongoing disagreements with Carmen. Carmen also

---

[6]     The IEP was ultimately released in April 2013; it indicated that M.L., then nine years old, had kindergarten or early first grade level reading and math skills, had severe delays in all areas of his adaptive living skills, and needed glasses.

[7]     At one point, Jessica received homeless assistance funds, but she used them to stay at a hotel for $100 per night rather than for low income housing for her family.

occasionally stated in front of the children that she would kick the family out of the home.

Because of the constant moving and providers' inability to reach her by telephone, Jessica was unable to effectively participate in most of the services offered to her, including a parenting program. In addition, her participation in individual and group therapy was inconsistent. Her individual therapist concluded in part that Jessica suffered from an adjustment disorder, mixed anxiety and disorganized thinking, was irresponsible and lacked insight. Based on Jessica's lack of progress in counseling, the therapist recommended that she undergo a psychological evaluation to determine whether she would be able to participate in treatment and protect the children.

In contrast, A.L. had completed a parenting class and consistently participated in individual therapy sessions, with his therapist reporting that he was capable of functioning as a protective parent, with patience as one of his strengths. Through domestic violence counseling, A.L. realized that he had not always handled stressful situations well, and worked on learning how to respond to escalating circumstances. With the Agency's assistance, A.L. also maintained regular visitation with the children, during which he was very engaged and demonstrated "positive role modeling." The children were very well behaved during visits and the boys began to deny Jessica's allegations about historical domestic violence and physical abuse by A.L.

At the family maintenance review hearing in October 2012, the court continued the children's placement with Jessica, but expressed concern about the impact her frequent moves had on the boys' education and her ability to participate in services, and ordered her to submit to a psychological evaluation. At M.L.'s request, he visited with A.L. after the hearing was over.

In March 2013, Jessica canceled authorized in-home parenting services because she and Carmen objected that the provider was asking too many personal questions. Based on Jessica's comments, the social worker was concerned about sending any other third party service providers into her home. Moreover, M.L.'s therapist reported Jessica had difficulty parenting M.L. and often engaged him in a power struggle that increased his "angry feelings and anger outbursts." The following month, A.L. began having unsupervised visits with the children.

A psychologist who evaluated Jessica in March 2013[8] concluded she suffered from a personality disorder that made her impulsive, suspicious, deceitful and irresponsible. The evaluator noted a high school psychological evaluation of Jessica characterizing her as manipulative and "capable of distorting the truth . . . to suit her immediate needs," and stated his belief that Jessica had utilized services in the dependency proceedings only to the extent they met her needs; he questioned whether she would be able to work through her issues in therapy but suggested that psychotropic medications might improve her cognitive functioning and stabilize her affect. Based on the evaluation, the Agency recommended, and the court ordered, Jessica to submit to a psychiatric examination.

Although Jessica's housing situation had finally begun to stabilize, she repeatedly expressed her intent to move again because of ongoing conflict with Carmen. Jessica reported feeling overwhelmed by the children and the family home was in total disarray, with food, clothing, and bags of dirty laundry all over the floor. Jessica was unable to consistently get the boys to school, despite several reminders about the importance of doing so, which resulted in M.L. being absent from school on 17 days and tardy 30 times, and M.C. being absent 14 days and tardy 28 times.

---

[8]     The evaluator noted that he had difficulty scheduling the evaluation because Jessica did not return his calls.

In June 2013, Jessica got a job, but then promptly quit, and moved the family to a hotel after she had a physical altercation with Carmen. During the next two months, the social worker received a series of messages from Jessica and Carmen in which they each made accusations against the other.[9]

In late July 2013, Jessica requested the social worker's assistance in getting housing for the family, although she stated she was going to ask the court to give A.L. custody of the boys. Jessica also stopped taking the boys to therapy, and missed her own therapy and domestic violence counseling sessions for several months. When Jessica met with the social worker, she reiterated that she was overwhelmed with caring for the children and trying to find a job and housing, and would probably ask that the children be placed with A.L. so she could get back on her feet. The social worker lost contact with Jessica in early August 2013.

In the interim, A.L. spoke to the social worker on a monthly basis and established that his home was large enough for all three children to be placed with him. He had consistently maintained his full-time employment with an aerospace company and had started overnight weekend visits with the children, although he had been unable to visit the children in June or July based in part on Jessica's refusal to facilitate visitation.

By mid-October 2013, Jessica and the children had moved back in with Carmen. Jessica called her social worker to ask for referrals to get back into therapy after her counsel advised her that she needed to do so. She had not shown much improvement in getting the boys to therapy or school, however, and she and Carmen continued to argue, although not as much as they had previously.

---

[9]     Among other things, Jessica accused Carmen of taking her money and physically abusing her and the children. At some point, she obtained a temporary restraining order against Carmen. Jessica later said she had made up the allegations against Carmen "to protect [herself]" because Carmen was threatening to seek removal of the children from her.

At about the same time, A.L. filed a section 388 petition to have the children placed with him based on the instability of the children's lives in Jessica's care, the inconsistency of the boys' school attendance, and Jessica's interference with his visitation. The court set the matter for a contested evidentiary hearing.

The court continued the contested hearing at the Agency's request based on Jessica's continuing refusal to cooperate with the social worker, and the Agency's need to do further follow-up with A.L. The court stated "This case is very frightening to me, quite candidly. It's not like I have been doing this for two months. I think that there's a potential that these kids are at risk, and that they are not being taken care of." It expressed frustration with the Agency's failure to timely evaluate A.L.'s situation, but also counseled Jessica that she might lose custody of the children if she continued to be uncooperative with the Agency. Jessica's counsel indicated the family would be moving again and provided the court and counsel with her client's new address and telephone number.[10]

After addressing a few safety issues identified by the Agency, A.L. received a positive home evaluation. He checked on enrolling the children in a school near his home, as well as after school childcare services, and had a good support network of family and friends in the area. Although A.L. had successfully completed his case plan, he was willing to undertake additional services, including domestic violence counseling, to facilitate custody. The social worker recommended that the children be slowly transitioned to A.L.'s care.

At a combined evidentiary hearing on A.L.'s section 388 petition and family maintenance review hearing in December 2013, the court received into evidence the

---

10    After this hearing, Jessica claimed for the first time that A.L. had sexually molested his biological sister. The social worker later determined the allegation to be unfounded and concluded Jessica made it up to try to retain custody of the children.

Agency's reports and heard testimony from the social worker, each of the parents, and Carmen.[11] Although the Agency recommended leaving the children in Jessica's care and increasing A.L.'s visitation with the possibility of later transitioning the children to his care, the court granted the section 388 petition and ordered the Agency to transition custody to A.L., with A.L. to participate in group domestic violence therapy and individual therapy for the children "forthwith." Jessica appeals.

## DISCUSSION

A party may petition the juvenile court under section 388 to change, modify or set aside a previous order. The petitioning party has the burden of showing, by a preponderance of the evidence, that there is a change of circumstances or new evidence and that the proposed modification is in the children's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) Whether changed circumstances exist and the proposed change is in the children's best interests are questions addressed to the sound discretion of the juvenile court and we will not disturb its decisions unless they were arbitrary, capricious or patently absurd. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) When two or more inferences reasonably can be deduced from the facts, we cannot reweigh the evidence or substitute our opinion for that of the juvenile court. (*Ibid.*)

### A.

*Changed Circumstances or New Evidence*

Jessica first contends the juvenile court abused its discretion by finding A.L.'s section 388 petition was supported by changed circumstances or new evidence. However, this argument disregards several significant changes in the circumstances that occurred during the pendency of the proceedings. Although the dependency petitions set forth allegations of a serious history of domestic violence and physical abuse by A.L.,

---

[11] Jessica was late for the hearing, which was significantly underway by the time she arrived.

many of those allegations were later dismissed and the evidence before the court at the hearing permitted it to reasonably conclude the facts underlying the remaining allegations were largely, if not completely, fabricated by Jessica and members of her family, in many instances so that Jessica could retain custody of the children.[12]

Further, although Jessica contends the children were doing well in her care, the evidence also suggested that she often put her own needs before theirs, moving them from one living environment to another, and failing to consistently get the boys to school and therapy. She exposed the children to her frequent and volatile confrontations with Carmen and others. She also had difficulty parenting the children, engaged in power struggles with M.L. and was often overwhelmed. Despite these issues, Jessica showed little insight into the children's needs, refused to accept that she needed help and did not participate in services offered to her until after it became clear that she had to do so to keep the children in her care. This evidence was sufficient to support the juvenile court's finding of changed circumstances.

## B.

### *Children's Best Interests*

The evidence cited above also supported the juvenile court's conclusion that placing the children with A.L. was in their best interests. Although they had not lived with A.L. alone in the past, he consistently expressed, and showed by his actions, his commitment to the children. Further, A.L. complied with the Agency's and the court's requirements to facilitate his relationship with the children. He had maintained a stable job, created an appropriate home environment for the children to move in with him, and had taken steps to ensure the boys would be enrolled in school.

---

[12] Despite Jessica's complaints to the contrary, the evidence substantiates A.L.'s consistent and vehement denial of the accusations of domestic violence and physical abuse by him.

10

By contrast, the children had been subjected to a very unstable situation while living with Jessica, one in which they moved around quite a bit and the boys did not consistently get to school or participate in court-ordered therapy. Moreover, the children were exposed to Jessica's use of fabrication as a means of accomplishing her own personal goals, without regard to their needs. The court acted within its discretion in concluding that placing the children with A.L. was in their best interests.

DISPOSITION

The orders are affirmed.

McDONALD, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.

11