Filed 7/6/15  In re Amir S. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re AMIR S., <br><br> a Person Coming Under the Juvenile Court Law. | B258838 <br> (Los Angeles County <br>  Super. Ct. No. CK79909) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> N.A., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court for Los Angeles County, Debra Losnick, Commissioner.  Affirmed.

Neale B. Gold, by appointment of the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

In this child dependency case, N.A. (father) appeals from the juvenile court's order denying without a hearing his Welfare and Institutions Code[1] section 388 petition requesting that the court's order terminating family reunification services and setting a section 366.26 hearing be changed and a new order issued returning his son, Amir, to his care or granting him further reunification services. Finding no abuse of discretion, we affirm the juvenile court's order.

## BACKGROUND

Amir came to the attention of the Los Angeles Department of Children and Family Services (the Department) in January 2012, when he was three months old. The Department received a referral for allegations of caretaker absence/incapacity and emotional abuse of Amir and his half-sister by their mother, Shelly S. (mother).[2] Mother's roommate had called the police to report that mother overdosed on medication. When the police arrived at mother's home, mother was outside, throwing up. The children were inside the house, in different bedrooms, sleeping. When the ambulance arrived, mother became belligerent and had to be restrained. While she was being transported to the hospital to be evaluated by a psychiatrist, mother told the ambulance workers that she overdosed on her daughter's psychotropic medication because she "wanted to end it all." At the time of the incident, father was incarcerated in Santa Ana, and was possibly going to be deported back to Afghanistan.

---

[1]    Further undesignated statutory references are to the Welfare and Institution Code.

[2]    Mother is not a party to this appeal, which does not involve Amir's half-sister. Therefore, our discussion of the facts focuses on only those facts relevant to Amir and father.

2

The Department placed the children with a foster caregiver and filed a dependency petition alleging two counts under section 300, subdivision (b), based upon mother's history of substance and alcohol abuse and mental health problems (Amir's half-sister had been the subject of a previous dependency matter in which a count alleging mother's history of substance and alcohol abuse was sustained). A detention hearing was held on January 19, 2012. Father was not present. The court found a prima facie case for detaining both children and ordered that they be placed in shelter care. The matter was continued to February 21, 2012 for a pretrial resolution conference.

In a jurisdiction/disposition report filed on February 21, 2012, the Department reported that father was incarcerated at an ICE detention facility at the Santa Ana City jail. The matter was continued to allow counsel to contact him, and then continued again (twice) to allow father to be present in court. Father appeared in juvenile court on May 7, 2012. The court deemed father to be the presumed father of Amir, set a visitation schedule for father, and set the matter for a contested disposition hearing on June 26, 2012.

In a report filed for that hearing, the Department stated that father came to the Department on May 16, 2012 to see the case social worker (the CSW). The CSW gave father the phone numbers for Amir's caregiver and the Foster Family Agency (FFA) social worker so he could schedule visits with Amir. Father told the CSW that mother used to bring Amir to visit him when he was in immigration jail. When asked why he was in jail, father explained that it was because he did not have immigration papers and he was going to be deported. He said he was released because he had been granted asylum.

In supplemental reports filed on the day of the contested disposition hearing, the Department noted that on May 16, 2012, father agreed that he would call the CSW when he secured a suitable home, but he had not called the CSW with his

3

address thus far.  He also had not returned telephone messages from the CSW, the foster caregiver, or the FFA social worker.  Because father had not returned any telephone messages, a dependency investigator (DI) from the Department attempted to hand deliver a letter to father at the address he had given the juvenile court at the previous hearing.  The woman who answered the door at that address said that father did not live there, and that her husband had not seen him for more than a month.  An hour later, father called the CSW, and a meeting was scheduled for a few days later.

At that meeting, father was interviewed by the DI.  When asked why he gave the court an address at which he did not live, father explained that he told his lawyer at the time of the previous hearing that he did not have a place to live, and he gave the court the address of his friend because he understood from his lawyer that the address was only needed for the purpose of receiving mail regarding the case.  Father told the DI that he currently was renting a room in a home with three bedrooms.  He said that he did not call the CSW with his new address because his phone was disconnected.

When asked about his immigration status and criminal history, father said he worked for two years in Afghanistan as a translator for soldiers.  He came to the United States in 2005 to marry his fiancée, who sponsored him and helped him get a green card and work permit.  They divorced in August 2007, and his work visa expired sometime later.  He said that he was Muslim but converted to Christianity in the United States, and claimed that some Afghan people with whom he was "hanging out" were against him because he converted.  He said those people "set [him] up" by planting gold jewelry in his car while he was sleeping at someone's house.  He was called by a detective, who asked for permission to search his car. He gave the detective permission, the jewelry was found, and father was charged with residential burglary.  He agreed to a plea bargain and was sentenced to a year

4

in prison; he served just over three months on the burglary and then was sent to ICE for deportation. Ultimately, he was granted asylum because he had worked as a translator for soldiers in Afghanistan.

Father told the DI that he was incarcerated beginning in January 2011, when mother was pregnant with Amir (Amir was born in October 2011), and remained incarcerated until April 20, 2012. Mother brought Amir to visit father three or four times while he was incarcerated. Since his release in April 2012, father visited Amir only once, on June 24, 2012 (two days before the contested disposition hearing).

Father appeared at the contested disposition hearing. The court ordered that a visitation schedule be set up for mother and father. The court also ordered the Department to evaluate father's housing and gave the Department discretion to release Amir to father. The court then continued the disposition hearing to August 28, 2012 to allow the Department to file a supplemental report addressing whether the Department could find a placement for Amir closer to mother and father.

In its report filed for the continued hearing, the Department reported on its evaluation of father's housing. It stated that the CSW visited the home at which father rented a room, and observed that there was a bed, a crib, a television, and sofa in father's room. The CSW also noted that there were six people living in the home: father, two couples, and the daughter of one of the couples. The CSW, however, expressed concerns that mother might be living with father. She noted that when she initially went to the home, she spoke with a man standing on the porch, who responded to her statement that she was there to see father by saying, "Oh, *they* just stepped out," and asking if "*they*" were expecting her. Also, when she called father, a woman answered the phone and hung up when the CSW identified herself. In addition, father's landlord told the DI that he often sees mother at the house. Finally, mother came with father to father's appointment with

the CSW, and mother and father came together to the Department to get bus passes. Because it appeared that mother was residing with father, the Department concluded that it was not in Amir's best interest to be placed in father's home.

At the continued disposition hearing held on August 29, 2012, the juvenile court declared Amir a dependent child of the court. The court ordered that father have unmonitored four-hour visits for the first two weeks, then overnight visits one day a week for the next two weeks, then two weeks of full weekend visits. Father was ordered to participate in a program of counseling as directed by the Department, with counseling to include parenting.

In the next report, filed on October 22, 2012, the Department reported that the CSW provided father with referrals for a parenting program on August 31, and that father started the program on October 2. The Department also reported that father had visits with Amir on September 2 and 9, then overnight visits on September 16 and 23, and then weekend visits starting on September 29, with no problems reported. At the hearing held on October 22, the court ordered Amir placed with father, over the Department's objection. The court stated, however, that the placement order was on condition that mother not be in father's home at all, and that father not monitor mother's visits.

On November 14, 2012, mother and father got into an argument when mother was at father's home. Mother began hitting father with a broomstick while father was holding Amir. Father called the police. When the police officers arrived, they found mother hiding in an upstairs bedroom. They observed defensive injuries on father and no injuries on mother. They arrested mother and released Amir to father.

Mother called the CSW later that afternoon, and told the CSW that she had been arrested. Mother said that she had been taking care of Amir since he was placed with father. She said that she lived in and managed the house where father

6

lived, and was financially supporting father because he was unemployed. The following day, the CSW went to father's home. Although the CSW did not observe any evidence that mother stayed in father's room, the CSW told father that Amir had to be detained because mother said that she resided with father and Amir and because father allowed mother access to Amir.

On November 20, 2012, the Department filed a supplemental petition alleging two counts. The first count alleged that mother and father engaged in a violent altercation in Amir's presence. The second count alleged that father allowed mother to frequent father's home and have access to Amir in violation of the juvenile court's orders. At the detention hearing on that same day, the court ordered Amir detained, with monitored visitation for father three times a week.

Two weeks later, the Department reported to the juvenile court that during the Department's investigation of a maternal aunt's home for possible placement, the maternal aunt and maternal grandmother told the CSW that mother and father often visited them together with Amir after Amir was released to father, and that mother and father told them that Amir was returned to both of them. In a report filed on January 15, 2013 for the jurisdiction/disposition hearing on the supplemental petition, the Department reported that the maternal aunt and another maternal aunt met with the CSW at her office and told her that mother had been living in one of the upstairs rooms in the same house in which father and Amir lived. They said that although mother was not allowed to go into father's room, she was seeing Amir in the shared areas of the house.

In that same report, the Department also reported that after Amir was detained, father did not respond to any of the CSW's messages or letters. On December 11, 2012, father contacted the CSW to request a visit with Amir. The CSW gave father the FFA social worker's contact information because that social worker would be scheduling and monitoring the visits. A few days later, father

7

called the CSW to tell her that the FFA social worker told him that she could not monitor a visit for him until January 7, 2013. The CSW spoke to the FFA social worker, who explained the various scheduling problems she was having with father. The CSW then called father, and asked if he had any family or friends who could live scan and be a monitor for his visits. Father said he had someone, but he needed to check and call her back. Father never called back.

Father did not appear at the jurisdiction/disposition hearing on January 15, 2013. At that hearing, the juvenile court sustained the supplemental petition. The court terminated the home of parent-father placement order, and ordered that custody of Amir taken from father and that Amir be placed in the care of the Department for suitable placement. The court also ordered that father participate in individual counseling to address domestic violence as a victim or an individual program for domestic violence victims.

The clerk of the juvenile court mailed the minute order from the jurisdiction/disposition hearing to father the following day. The CSW sent father the court-ordered case plan and referrals for parenting classes, individual counseling and domestic violence programs the day after that (January 17, 2013). The next day, the CSW left a message for father and sent him letters (by first class mail and certified mail), telling him she had scheduled weekly visitation for him at the family visitation center, since he was having difficulty scheduling visitation with the FFA social worker.

On January 25, 2013, father called the CSW to complain about trying to schedule visitation with the FFA social worker. The CSW told father that she had been trying to reach father by phone and mail since Amir was detained in November 2012, but father would not return her calls or respond to her letters. Father said that he had moved out of the house where he was living. The CSW asked him to provide his new address, and father said he would come to the office

8

to give it to her. He made an appointment to come in at 9:30 a.m. on January 30, but failed to show up. After waiting for an hour, the CSW called father, who said he was on his way. Father never showed up and did not answer or return any of the CSW's phone calls.

Over the next eight months, the CSW attempted to contact father numerous times by phone and by mail, but father did not respond. Finally, on August 27, 2013, father called the CSW and asked to meet with her. He came to the CSW's office the next day to tell her that he did not want mother's family to be around Amir. He did not ask about visiting Amir (he had not visited Amir since Amir was detained on November 15, 2012). Nevertheless, the CSW gave him the phone number for the FFA social worker so he could set up monitored visits. The CSW also asked father if he was in any programs; father said he was not.

In September 2013, father called the CSW twice to complain that the FFA social worker was not allowing him to visit with Amir. Both times, the CSW called the FFA social worker, who explained that the problems in scheduling visits had to do with father either declining the offered dates then changing his mind at the last minute (by which time the FFA social worker had already scheduled something else), or failing to call the foster caregiver (whose phone number had been given to him) when the FFA social worker was on vacation. The CSW then scheduled a visit for father in late September, but father could not attend it because he did not have a ride.

A hearing under section 366.21, subdivision (f) was conducted on October 3, 2013. Father did not appear; the juvenile court denied father's counsel's request for a continuance. The court terminated family reunification services and scheduled a permanent plan hearing under section 366.26 on January 30, 2014.

In its report filed for the section 366.26 hearing, the Department reported that Amir had developed a significant relationship with his caregiver and her

family, with whom he had been living since November 2012, and the caregiver was interested in adopting him. The Department also reported that mother was deported to Belize in February 2013, and has had no face to face contact with Amir since then (although she has called the caregiver and the Department to ask about Amir), and father has not visited Amir since Amir was detained in November 2012. The Department noted there had been ongoing efforts by the Department and the FFA to facilitate visits by father, but father either called to request a visit immediately (which did not allow the Department time to arrange for a monitor) or failed to show up to scheduled visits. The Department recommended that Amir be placed for adoption.

Father appeared at the January 2014 section 366.26 hearing. His counsel told the juvenile court that father has had difficulty setting up visits, and asked that visits be set up at the hearing. Over the objection of Amir's counsel and counsel for the Department, the court ordered one hour visits once a week on a schedule. The court then continued the hearing to April 3, 2014 to have a home study of the prospective adoptive home completed.

The CSW met with father on February 10, 2014 to develop a visitation plan. Father was offered two different days and time slots for visits, and chose one. The CSW told father he had to contact the monitor 24 hours before each visitation to confirm the visit, and gave him a letter reiterating that information and providing the monitor's phone number. Father failed to confirm or cancel before the first scheduled visit, and did not show up for the visit. The CSW called father the next day to ask about the missed visit, but father did not return her call. The CSW then mailed a letter to father's address, asking him to contact her; he did not do so. A month later, the CSW tried to contact father at his phone number and his girlfriend's phone number, but both numbers appeared to have been disconnected.

The section 366.26 hearing was continued again to July 2, 2014 to allow the Department to complete the home study. Father appeared at the July 2 hearing, at which the matter was continued to August 21, 2014.

On the date of the continued hearing, August 21, 2014, father filed a petition under section 388, seeking to change the October 3, 2013 order terminating reunification services and setting the section 366.26 hearing. Father alleged that circumstances had changed because he enrolled in a parenting program and was on the waiting list for individual counseling, and he was having monitored visits with Amir.[3] He asked the court to order that Amir be returned to his custody or, in the alternative, order additional reunification services and unmonitored visits. He alleged that his requested order was in Amir's best interest because he was bonded to Amir, and Amir would not have a relationship with his father or paternal relatives if parental rights were terminated.

The juvenile court addressed father's section 388 petition at the continued section 366.26 hearing on August 21, 2014, which father attended. In response to the court's question as to whether father wished to present any witnesses or documents for the section 366.26 hearing, father's counsel said that before she presented any witnesses, she was requesting that the court grant father's petition that was filed that morning. The court responded, "As counsel know, I don't normally address 388's on the record. However, this is not timely. We are set for a .26. We have been set for a .26 since January of 2014. [¶] Having looked at this, the father has not completed the case plan. He is on a wait list. At best, his

---

[3] Father attached as an exhibit to the petition a letter from the Akoko Nan Parent Education & Support Group stating that he had completed 11 parenting classes, and was expected to receive a certificate of completion after completing 20 classes.

circumstances would be changing, and I would not have granted it, and I am not going to today."[4]

The court then moved on to the section 366.26 hearing, and father's counsel called father as a witness. Father testified that he was currently visiting Amir every Monday for an hour at Amir's foster home. He said that when he arrives for his visits, Amir runs to him and calls him "Dad." When the visit is over, Amir seems sad and says, "Bye, Dad. I will see you next week." Father testified that he did not visit Amir for a period of time because he is a single father with a job who does not have anyone to help him. On cross-examination, father admitted that he did not start visiting Amir until two months before the hearing.

The juvenile court found that no exception applied and terminated father's and mother's parental rights. Father timely filed a notice of appeal from the minute order denying his section 388 petition and terminating his parental rights.

## DISCUSSION

Father contends the juvenile court abused its discretion by denying his section 388 petition without a hearing. We disagree.

Section 388 provides in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) The petition must be verified and must contain "[a] concise statement of any change of circumstance or

---

[4] The minute order from the hearing also states that father's petition was denied because "[t]he best interest of the child(ren) would not be promoted by proposed change of order."

12

new evidence that requires changing the order." (Cal. Rules of Court, rule 5.570(a)(7); see also § 388, subd. (a)(1).)

The statute commands that "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held." (§ 388, subd. (d).) The petition must "be liberally construed in favor of granting a hearing to consider the parent's request." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; see also *In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) "The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.)

In the present case, as noted, the juvenile court denied the petition at the section 366.26 hearing without an evidentiary hearing on the petition. Father challenges the juvenile court's denial of his petition on several grounds.

First, father argues that the court "misunderstood the law" when it stated that it did not normally address section 388 petitions on the record. He misconstrues the court's statement. The court did not say, as father seems to suggest, that it does not normally hold a hearing on the record when a party files a sufficiently pleaded section 388 petition. Rather, the court was merely indicating that it does not normally address the sufficiency of the petition at a hearing. That practice is consistent with the statute, which requires a hearing only if the petition makes a prima facie showing of changed circumstances or new evidence requiring a modification of a previous order and that the modification would promote the best interests of the child. (See *In re Justice P.* (2004) 123 Cal.App.4th 181, 188 ["the court may summarily deny the [petition] if the petition fails to make a prima facie showing"].) In any event, the juvenile court *did* address the sufficiency of the petition on the record, and found that it was not timely and not sufficient to warrant a hearing because it alleged changing circumstances rather than changed circumstances.

13

Father challenges each of those findings on appeal. We need not address the court's timeliness finding, however, because we conclude the court's denial may be affirmed based upon the court's other finding.

The petition was filed the day the section 366.26 hearing was to be held to select and implement a permanent plan for Amir. By that time, Amir had developed a significant relationship with his caregiver, with whom he had lived since he was removed from father's care in November 2012, and the caregiver wanted to adopt Amir. The caregiver's home study had been completed and approved. The focus of the proceedings at that point was on Amir's need for permanency and stability. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

It is against this background that the juvenile court found father's petition alleged changing circumstances that were insufficient to justify a hearing on the petition. That finding is supported by the record before the court. (See *In re Justice P.*, *supra*, 123 Cal.App.4th at p. 189 ["In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case"].)

The record shows that father was ordered to participate in a parenting program in August 2012, and was ordered to participate in a domestic violence program or individual counseling in January 2013. From the time Amir was removed from his care in November 2012 to the time reunification services were terminated and the section 366.26 hearing was set in October 2013, father had made no effort to comply with the court's orders, nor had he visited Amir or inquired about Amir's well-being. Nor did father make any effort to comply with the orders over the next seven or eight months (during which time the section 366.26 hearing was continued three times). He also failed to visit Amir for most of that time.

14

He finally began to comply with his court-ordered case plan shortly before he filed his petition in August 2014. At that time, he had completed just over half of the required parenting classes he had been ordered to attend two years before, and was merely on a wait list to start the domestic violence program or counseling he had been ordered to attend more than a year and a half before the petition was filed. He also had just started to visit Amir, after an 18-month delay, two months before he filed his petition.

Thus, although the circumstances at the time father filed the petition certainly were different than the circumstances at the time the juvenile court terminated reunification services, in that father had started to comply with the court's orders and to visit Amir, the circumstances were not so changed as to require a hearing on the petition. As one court observed, "[a] petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] '"[C]hildhood does not wait for the parent to become adequate."' [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) In short, the juvenile court did not abuse its discretion by denying father's petition without a hearing. (See, e.g., *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1451 [finding no abuse of discretion in denying petition without a hearing despite allegations that mother had entered a drug program and other court-ordered programs after failing to participate in court proceedings or comply with court-ordered case plan for 18 months.)

## DISPOSITION

The order denying father's section 388 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

16