Filed 9/18/20  In re D.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOUTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.D. et al., Persons Coming Under the Juvenile Court Law. | |
| | D077360 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. EJ4016A-B) |
| v. | |
| G.W., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

Five months after the juvenile court terminated the parental rights of the parents of dependents D.D. and A.D. and selected a permanent plan of

1

adoption for them under Welfare and Institutions Code section 366.26,[1] the children's maternal grandmother, G.W., filed a section 388 petition seeking to modify the prior section 366.26 orders and have them placed with her.  Her petition alleged that because the San Diego County Health and Human Services Agency (Agency) removed the children from their initial prospective adoptive home and temporarily placed them with the Polinsky Children's Center (PCC), there had been a change of circumstances since the prior orders and also that it was in their best interests to be placed with her.  Finding she had not made a prima facie showing of either changed circumstances or that her proposed order was in the children's best interests, the court summarily denied her section 388 petition.

On appeal, she contends the court:  (1) erred by summarily denying her section 388 petition because she made a prima facie showing of changed circumstances and that placement with her was in the children's best interests; and (2) should have applied section 361.3's relative placement preference in considering her section 388 petition or concurrent request for placement of the children with her.  We affirm the orders denying her petition.

FACTUAL AND PROCEDURAL BACKGROUND

In 2015, A.D. was prematurely born.  She had an older brother, D.D., who was born in 2012.  Although A.D. and her mother tested negative for drugs at the time of A.D.'s birth, her mother subsequently reported she had used crack cocaine, methamphetamine, and alcohol two days after she gave birth.  Her mother also reported that she had been diagnosed with schizoaffective disorder and bipolar disorder and had not taken her

---

1      All statutory references are to the Welfare and Institutions Code unless otherwise specified.

medications for four months. A.D.'s father reported that he lived in a tent and took medications for bipolar disorder and depression. He tested positive for marijuana use. D.D. and A.D.'s mother and father agreed with the Agency that they would participate in voluntary services while their children were cared for out of their home. D.D. was placed with his maternal grandmother and A.D. was placed in a foster home that could meet her special medical needs. However, their parents subsequently failed to engage in reunification services, did not consistently visit the children, and could not be located by the Agency.

In 2016, the Agency filed section 300 dependency petitions for D.D. and A.D., alleging they had suffered, or were at substantial risk of suffering, serious physical harm or illness because of their parents' inability to provide them with regular care due to mental illness or substance abuse. At their detention hearing, the court found prima facie showings on the petitions' allegations had been made by the Agency, detained the children, and granted supervised visits to their parents. The Agency continued D.D.'s placement with his grandmother and A.D.'s placement in her foster home.

At their jurisdiction and disposition hearing, the court found the petitions' allegations to be true, removed the children from their parents' custody, and ordered that they be placed with a relative.[2] In its six-month status review report, the Agency stated that their mother had not participated in services and it could not locate their father. Although the Agency had considered placing A.D. with a relative, the maternal grandmother stated she was not interested in caring for A.D. and just wanted to see her and be her grandmother. The grandmother was unable to meet

---

[2] Despite that placement order, A.D. continued to be placed in the foster home.

3

A.D.'s special needs and had attended only one of A.D.'s doctor's appointments. The Agency recommended that the court terminate the parents' reunification services and set a section 366.26 hearing. The Agency further recommended that A.D. not be placed with her maternal grandmother and instead be placed in her specialized foster home.

In her report, the children's court appointed special advocate (CASA) stated that although the maternal grandmother did not work, she took D.D. to daycare Monday through Friday from 9:00 a.m. to 6:00 p.m., and he was the first child to be dropped off and the last child to be picked up. Although his maternal aunt organized a birthday party for him, the grandmother arrived very late. From April 2016 to August 2016, D.D. slept on a sofa at his maternal aunt's home. The grandmother told the CASA that she had been sleeping at her boyfriend's home and he did not want any children living in his home. Also, D.D., at four years old, was still wearing pull-up diapers. The grandmother stated that she would prefer not to care for a child at this stage of her life, but did not want D.D. to go to a foster home. She hoped that his mother would become sober and be able to care for him again.

In October 2016, the maternal grandmother filed a section 388 petition, seeking placement of A.D. with her or placement of both D.D. and A.D. with their maternal aunt.

In its December 2016 addendum to its six-month status review report, the Agency stated that the children's maternal aunt had asked that the children be placed with her. The Agency also recommended that the court grant the children's father an additional six months of reunification services. In January 2017, the court granted the grandmother's section 388 petition and ordered that D.D. and A.D. be placed in an approved home of a relative.

4

At the contested six-month review hearing, the court terminated the mother's reunification services, ordered additional services for the father, ordered that the children be placed with a relative, and set a 12-month review hearing.[3]

In its 12-month status review report, the Agency stated that the children had been placed in the maternal aunt's home in January 2017 and appeared to be thriving. Because their father had not participated in reunification services, the Agency recommended that the court terminate his services and set a section 366.26 hearing for the children.

At the contested 12-month review hearing, the court terminated the father's reunification services and set a section 366.26 hearing. The court also continued the children's placement in the approved home of a relative (i.e., the maternal aunt).

In its section 366.26 report, the Agency stated that it believed the children were specifically and generally adoptable, and it recommended that the parents' parental rights be terminated and a permanent plan of adoption be selected for the children. It stated that their current caregiver (i.e., the maternal aunt) had expressed a desire to adopt them. In her report, the CASA stated the children were doing well in the maternal aunt's home and recommended that they remain in their current placement.

At the August 2017 section 366.26 hearing, the court terminated the parents' parental rights and selected adoption as the children's permanent plan.

In September 2017, on the mother's and father's appeals from the juvenile court's jurisdictional and dispositional orders for the children, we

---

[3]    At the hearing, the court also denied the mother's section 388 petition alleging defective notices had been given by the Agency.

reversed the orders, concluding that the Agency had not given the father proper notice and had not complied with the notice provisions of the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.), and directed the court to provide proper notice on remand. (*In re D.D.* (D071771, Sept. 18, 2017) [nonpub. opn.].)

On remand, the juvenile court conducted a new contested jurisdiction and disposition hearing in February 2018, found the petitions' allegations to be true, removed custody of the children from their parents, denied the parents reunification services pursuant to section 361.5, subdivision (b)(1), and set a review hearing. The children continued their placement with an approved home of a relative (i.e., the maternal aunt).

At the new contested six-month review hearing in September 2018, the court found that proper ICWA notices had been given, ICWA did not apply, and the parents had made no progress toward reunification with their children and could not be located. The court set a section 366.26 hearing.

In December 2018, the Agency filed section 387 petitions seeking to change the children's placement from the home of a relative, alleging that their current placement was not appropriate and seeking to place them in foster care. In particular, the petitions alleged that the relative caregiver (i.e., the maternal aunt) had exposed the children to domestic violence in their home and was no longer willing or able to provide adequate care and supervision for them. In its detention report in support of its section 387 petitions, the Agency stated, inter alia, that the maternal aunt had allowed a woman to live in her home with the children and with whom she had a physical altercation in the children's presence. That woman also informed the Agency that she cared for the children about 95 percent of the time. The Agency had temporarily placed the children with the maternal grandmother

6

and sought an emergency clearance of her home through the resource family approval (RFA) process. However, because her home was not cleared on an emergency basis, the children were moved to A.D.'s previous foster home. The foster parent informed the Agency that she was interested in adopting the children if placement with the maternal grandmother was unsuccessful. The court found the allegations in the section 387 petitions to be true and ordered that the children be placed in a foster home.

However, in February 2019 after the foster parent asked that the children be removed, they were placed at PCC and then in the care of a foster home that was not interested in adoption. The processing of grandmother's RFA application had not been completed because she had not signed a release of information despite two 30-day notices requesting the release and being informed her application would be closed without the release of information. Between February and April 2019, neither the maternal aunt nor the maternal grandmother visited the children. In May 2019, based on alleged neglect and failure to protect the children from sexual abuse by another child in their current foster home, the children were moved to another foster home.

At the scheduled June 2019 section 366.26 hearing, the court continued the hearing based on the Agency's request for additional time to allow the children to stabilize in their new foster home. Counsel for the mother informed the court that she then intended to raise the issue of assessing the suitability of the maternal grandmother for placement of the children under section 361.3 and the issue of her RFA evaluation. The court informed the maternal grandmother that she needed to complete all of the requirements for her RFA application to be considered for placement of the children. By August 2019, the grandmother had complied with the RFA requirements and

7

her application was being processed, but there had been a delay in receiving supporting documents.

In its section 366.26 report, the Agency recommended that the court terminate the parents' parental rights and that it select a permanent plan of adoption for the children. Their current foster home was interested in adopting them.

At the August 27, 2019 contested section 366.26 hearing, the court initially denied the mother's request for a continuance to allow more time to complete the grandmother's RFA evaluation, stating that much of the delay was the result of the grandmother's reluctance to comply with the RFA process. The court also stated that as of the date of the hearing, neither the Agency nor it could legally place the children with the grandmother because her home had not yet been approved. The court received in evidence the Agency's reports and addenda thereto, the CASA's report, and heard testimony from the Agency's social worker who had been assigned to the case since February 2019. After hearing arguments of counsel, the court found, by clear and convincing evidence, that the children were adoptable and that no exception to termination of parental rights applied. The court terminated the mother's and father's parental rights, selected adoption as the children's permanent plans, and ordered that the children remain placed with the Agency for adoptive placement.

In October 2019, the Agency removed the children from their prospective adoptive home after it substantiated an allegation of general neglect. After the children were cared for at PCC for a couple of weeks, the Agency placed them in the home of a nonrelative extended family member (NREFM) who was a friend of the maternal aunt and had been approved through the RFA emergency process. However, the NREFM cared for the

children for only two weeks because D.D. made an unfounded claim of neglect and then the caregiver dropped the children off at PCC, claiming that caring for the children was too much for her. The Agency notified the court that it had made a change of placement at the same placement level.

The children remained at PCC for a couple of months while the Agency sought to locate a new prospective adoptive home. Ultimately, in January 2020, the Agency located an Orange County prospective adoptive mother, who met the children and then invited them to her home for two overnight visits. The children's CASA reported that at the beginning of the second overnight visit, the children ran to the foster mother and hugged her and then ran upstairs to "their" rooms. On the return trip home, they told the CASA they had a good time. The foster mother stated that she asked to take time off from work to bond with the children and make sure it was a good fit for them because she wanted it to be their last placement. At a child and family team (CFT) meeting in late January, the team discussed that D.D. liked the foster mother and wanted to live with her. The foster mother subsequently visited the children in San Diego and attended D.D.'s individualized education plan (IEP) meeting at school. When the Agency's social worker asked D.D. how he felt about the foster mother, he replied that he liked going to her home and wanted to stay there, asking, "Forever?" He told his teacher he was glad the foster mother was taking her time to be sure she was ready to care for him and his sister, instead of taking them right away. D.D. felt like he had a voice in his placement for the first time because he was able to meet the foster mother before being placed with her. He was okay with switching schools if his new family could be his forever family.

In mid-February 2020, the foster mother confirmed that she wanted to adopt D.D. and A.D. and asked the Agency if she could discuss it with them

at their upcoming weekend visit. After that visit, the CASA reported that D.D. was extremely happy that he had a forever home. The CASA also heard A.D. tell the foster mother, "I love you."

Around that time, the maternal aunt contacted the Agency social worker and was upset that the children were having preplacement visits with a new foster home. She believed the Agency was going to wait until the maternal grandmother could be approved for their placement. A couple of days later, the Agency placed the children with the new prospective adoptive mother who had taken eight weeks off of work to bond with them.

On February 10, 2020, the maternal grandmother filed a section 388 petition seeking to change the section 366.26 orders issued on August 27, 2019, at which the court denied the requests for a continuance to allow her time to complete the RFA process and have the children instead placed with her.[4] Regarding the changes that she alleged had occurred since the prior orders, she asserted that in November 2019 the children were removed from their prospective adoptive home and placed at PCC where they remained. She further alleged placement with her would be in the children's best interests because they were bonded to her, wanted to be placed with her, and placement with relatives would be better for them than "languishing" at a temporary shelter (i.e., PCC). She did not attach any documents in support of her section 388 petition. Importantly, she did not allege, nor submit any evidence showing, that her home had been approved for placement through the RFA process.

---

[4]     In the mother's appeal challenging the August 27, 2019 section 366.26 orders, we affirmed the juvenile court's denial of a continuance and its finding that the beneficial parent-child relationship exception did not apply to preclude termination of her parental rights. (*In re D.D.* (D076428, Feb. 24, 2020) [nonpub. opn.].)

10

In its report, the Agency recommended that the court deny the section 388 petition. As of late February 2020, the grandmother's RFA application had not yet been approved and the children were in an adoptive placement. Also, the Agency had concerns regarding the maternal grandmother's ability to care for D.D. and A.D. Her past statements and visitation patterns showed she was not committed to caring for the children. For example, from April 2019 to August 2019, the maternal grandmother visited the children only five times and most of those visits had been requested by the maternal aunt.

At the February 27, 2020 hearing on the section 388 petition, counsel for the maternal grandmother represented that her RFA application was still pending and argued the Agency should provide her with its reasons for any denial. Also, her counsel argued that if the court does not place the children with the maternal grandmother, she should be considered as a backup placement if the current adoptive placement failed. The Agency argued that the court should summarily deny the section 388 petition because the maternal grandmother had not made prima facie showings of changed circumstances or that her proposed order was in the children's best interests. Counsel for the children stated that although they told her they wished to live with the grandmother, her position as their guardian ad litem was that the court should summarily deny the section 388 petition. The CASA reported that D.D. had made a smooth transition to his new school and A.D. would be starting preschool soon and enjoyed walking the prospective adoptive mother's two dogs. In rebuttal, counsel for the maternal grandmother argued she had made a prima facie showing in support of her section 388 petition and also argued that the court should evaluate placement of the children with the maternal grandmother pursuant to section 361.3.

The court summarily denied the maternal grandmother's section 388 petition, finding that she had not made a prima facie showing of changed circumstances. It also found that she had not made a prima facie showing that placement of the children with her was in their best interests because her home had not been approved and it could not lawfully place them with her. Nevertheless, the court directed the Agency to work with the maternal grandmother to quickly complete its evaluation of her RFA application.

The maternal grandmother timely filed a notice of appeal challenging the February 27, 2020 orders denying her section 388 petition.

DISCUSSION

I

*No Prima Facie Showing on Section 388 Petition*

The maternal grandmother contends the court erred by summarily denying her section 388 petition because she made prima facie showings of changed circumstances and that placement with her was in the children's best interests.

A

Section 388 allows a parent or other interested person to petition the juvenile court to change, modify, or set aside a previously made dependency order. (§ 388, subd. (a)(1).) The petitioner has the burden of proof to show that there are changed circumstances or new evidence and that the requested change would be in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*); *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 (*Anthony W.*).) A section 388 petition must be liberally construed in favor of its sufficiency. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461 (*Angel B.*).) The moving party must show *changed*, not merely changing, circumstances. (*In re Casey D.*

12

(1999) 70 Cal.App.4th 38, 47.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child . . . does not promote stability for the child or the child's best interests." (*Ibid.*)

The petitioner "need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) However, if the petitioner does not meet that threshold showing, the juvenile court in its discretion may deny a request for a section 388 hearing. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415 (*Jasmon O.*).) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 (*Zachary G.*).) The petition's allegations must be specific regarding the evidence to be presented and must not be conclusory. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478 (*Alayah J.*).) In deciding whether a prima facie showing has been made, the court may consider the entire factual and procedural history of the case. (*Jasmon O.*, at p. 415; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 616 (*Mickel O.*).) A summary denial of a section 388 petition does not violate due process. (*Jasmon O.*, at p. 415; *Angel B.*, *supra*, 97 Cal.App.4th at p. 460.)

The decision whether to grant or deny a section 388 petition is within the discretion of the juvenile court. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; *In re Y. M.* (2012) 207 Cal.App.4th 892, 920.) Likewise, a decision to summarily deny a section 388 petition without an evidentiary hearing is within the juvenile court's discretion. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 460; *Zachary G.*, *supra*, 77 Cal.App.4th at p. 808.) On appeal, a reviewing court will not disturb a discretionary decision by the juvenile court unless it abuses its discretion by making an arbitrary, capricious, or patently absurd

13

determination. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) The appellant has the burden on appeal to affirmatively show that the juvenile court abused its discretion. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

B

Contrary to the maternal grandmother's assertion, we conclude the court did not abuse its discretion by summarily denying her section 388 petition. First, we conclude her petition did not make a prima facie showing of changed circumstances since the August 27, 2019 section 366.26 orders. Her petition alleged that there were changed circumstances, citing the fact that in November 2019 the children had been removed by the Agency from their initial prospective adoptive home and then temporarily placed at PCC.[5] However, as the Agency asserts, the children's placement level did not change during that entire period. The August 27, 2019 orders terminated the

_____

[5] The section 388 petition further alleges: "Contrary to the Agency's claims of numerous families willing to adopt the [children], [they] still remain[] at [PCC]." Although the maternal grandmother argues on appeal that this statement in her petition, in effect, alleged circumstances had changed regarding the number or availability of families "willing" to adopt the children (or, more accurately, "possible" adoptive families) and the children's adoptability, we disagree. Rather, that allegation asserted, at most, that after the children were removed from their initial prospective adoptive home, they were temporarily placed by the Agency at PCC and, at the time of the section 388 petition (i.e., February 10, 2020), they remained at PCC. The petition did *not* allege that since the section 366.26 order the children were no longer adoptable, whether generally or specifically. To the extent the maternal grandmother raises that new theory of changed circumstances on appeal, we decline to consider it because it was not raised below. (Cf. *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [party is not permitted to change his trial theory or position and adopt new theory on appeal]; *Cox v. Griffin* (2019) 34 Cal.App.5th 440, 443 [new causes of action raised on appeal are not cognizable].)

14

parents' parental rights, selected adoption as the children's permanent plans, and ordered that the children remain placed with the Agency for adoptive placement. The record shows that the children remained placed with the Agency during the entire period between August 27, 2019 and February 27, 2020. Although the Agency removed the children from their initial adoptive placement in October 2019 and temporarily placed them with PCC (with an interim two-week stay at the home of an NREFM) until the Agency found a new adoptive home for them, the Agency found a potential adoptive mother in January 2020 and had placed the children with her by mid-February 2020. Therefore, throughout the entire period, the children were placed with the Agency for adoptive placement. Despite the Agency's subsequent changes in their physical placements, they remained in the same level of placement under section 366.26, subdivision (j)[6] (i.e., with the Agency for adoptive placement). Furthermore, at the time of both the August 27, 2019 hearing and the February 27, 2020 hearing, the children were in prospective adoptive homes, albeit different ones, and throughout that period remained in the exclusive custody and control of the Agency.[7] (§ 366.26, subd. (j).) Therefore,

---

[6] Section 366.26, subdivision (j) provides: "If the court, by order or judgment, declares the child free from the custody and control of both parents . . . , the court shall at the same time order the child referred to the . . . county adoption agency [i.e., the Agency] . . . for adoptive placement by the agency. . . . The . . . county adoption agency [i.e., the Agency] . . . shall be responsible for the custody and supervision of the child and shall be entitled to the exclusive care and control of the child at all times until a petition for adoption . . . is granted, except as specified in subdivision (n) [regarding a prospective adoptive parent who has been the child's caregiver for six consecutive months]."

[7] In her reply brief, the maternal grandmother argues that Agency's respondent's brief wrongly relied on *In re Harry N.* (2001) 93 Cal.App.4th 1378 in support of its argument that after the section 366.26 order it was

15

we conclude the section 388 petition did not make a prima facie showing that there had been a change of circumstances since the August 27, 2019 orders. To the extent the maternal grandmother argues otherwise, her argument is conclusory and not supported by any apposite case citation. Based on her failure to make a prima facie showing on the first element of changed circumstances, that failure alone is sufficient to support our conclusion that the court did not abuse its discretion by summarily denying her petition. (*Jasmon O.*, *supra*, 8 Cal.4th at p. 415; *Stephanie M.*, *supra*, 7 Cal.4th at

---

responsible for placing the children and selecting an adoptive home for them. She argues Agency should not have cited that case because it was superseded by the Legislature's subsequent enactment of section 366.26, subdivision (n). That statute generally provides that a prospective adoptive parent who has, among other things, been a child's caregiver for six consecutive months may file a petition objecting to any proposed removal from the caregiver's home and, after a hearing, the court must decide if the proposed removal is in the child's best interests. (§ 366.26, subd. (n).) To the extent section 366.26, subdivision (n) superseded certain language in *In re Harry N.*, that statute did so on grounds other than those on which Agency relied in support of its argument that the children's placement level in this case had remained the same (i.e., the Agency had the exclusive care and control of the children pursuant to section 366.26, subdivision (j)). (See, e.g., *Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1336-1341; *In re M.H.* (2018) 21 Cal.App.5th 1296, 1307.) Furthermore, because the maternal grandmother does not, nor could she persuasively, argue that she qualified as a prospective adoptive parent within the meaning of section 366.26, subdivision (n), the authority of the juvenile court thereunder to determine the best interests of the children regarding their proposed removal from their caregiver's home in November 2019 is irrelevant to the instant case and does not show the children had not remained in the same level of placement under section 366.26, subdivision (j) throughout the period from the August 27, 2019 section 366.26 hearing through the February 27, 2020 hearing on the section 388 petition. As we concluded *ante*, the children remained in the exclusive care and control of the Agency throughout that entire period despite changes made by the Agency in their caregivers. (§ 366.26, subd. (j).)

16

p. 317; *G.B.*, *supra*, 227 Cal.App.4th at p. 1157; *Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.)

Second, in any event, we also conclude the maternal grandmother's section 388 petition did not make a prima facie showing that her requested order placing the children in her care was in their best interests. Her petition alleged, in a conclusory fashion, that placement of the children with her would be better for them than their then-current placement at PCC because they were bonded to her and wanted to be placed with her. However, she did not cite to any supporting evidence that she could present at an evidentiary hearing which, if true, would have supported a finding that it was in the children's best interests to be placed with her rather than in a prospective adoptive home selected by the Agency for their possible permanent placements. As discussed *ante*, the allegations in a section 388 petition must be specific regarding the evidence to be presented and must not be conclusory. (*Alayah J.*, *supra*, 9 Cal.App.5th at p. 478; cf. *In re K.L.* (2016) 248 Cal.App.4th 52, 62-63 (*K.L.*) [section 388 petitions did not state prima facie cases because they contained only conclusory allegations that placement of children with grandmother would be in their best interests because they were comfortable with her and she could provide stability and permanent place for them].) The allegations in the grandmother's petition regarding the children's best interests did not meet that standard and failed to specify what evidence could be presented at an evidentiary hearing to show placement of the children in her care was in their best interests.

Furthermore, in deciding whether a prima facie showing has been made, the court may consider the entire factual and procedural history of the case. (*Jasmon O.*, *supra*, 8 Cal.4th at p. 415; *Mickel O.*, *supra*, 197 Cal.App.4th at p. 616.) Here, there was ample evidence in the record

showing the maternal grandmother's ambivalence, if not disinterest, in caring for the children. As she informed the CASA early in the children's dependency cases, she preferred not to care for a child at that stage of her life, but nevertheless did not want them to go to a foster home. In fact, when she cared for D.D. early in his dependency case, D.D. slept at the maternal aunt's home for months while the maternal grandmother stayed overnight at her boyfriend's home. Furthermore, although she did not work, she took D.D. to daycare five days a week where he was the first child to be dropped off and the last to be picked up. After she no longer cared for D.D., the maternal grandmother had an inconsistent visitation record and had gone months with few, or no, visits with the children. The record also shows that her dilatory conduct in completing her RFA application (e.g., not timely signing all required forms for the release of information) was a significant reason why the Agency had not yet completed its RFA evaluation.[8] Accordingly, considering the entire factual and procedural history of the children's dependency cases, the court could reasonably find that, even if the maternal grandmother's allegations were true that the children were bonded to her and they wanted to be placed with her, the stability of a permanent, adoptive home was in their best interests rather than placement with her. Therefore,

---

[8] The court concluded *post*, and the Agency asserts on appeal, that the court could not lawfully place the children with the maternal grandmother until her RFA application had been completed and approved. The Agency cites section 16519.5, which provides in part: "A resource family shall be considered eligible to foster care for children . . . and approved for adoption and guardianship." (§ 16519.5, subd. (c)(4)(A).) Because, as discussed *ante*, there is other evidence supporting the court's finding that the maternal grandmother did not make a prima facie showing that placement of the children with her was in their best interests, we need not, and do not, address the issue of whether the lack of approval of her RFA application, by itself, precluded the court's placement of the children with her.

18

we conclude the court did not abuse its discretion by finding that she did not make a prima facie showing that placement of the children with her was in their best interests. Based on her failure to make a prima facie showing on the second element of the children's best interests, that failure, whether considered alone or together with her failure to make a prime facie showing on the first element of changed circumstances as discussed *ante*, is sufficient to support our conclusion that the court did not abuse its discretion by summarily denying her petition. (*Jasmon O.*, *supra*, 8 Cal.4th at p. 415; *Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *G.B.*, *supra*, 227 Cal.App.4th at p. 1157; *Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.) None of the cases cited by the maternal grandmother are apposite to this case or otherwise persuade us to reach a contrary conclusion. (See, e.g., *In re Kimberly F.* (1997) 56 Cal.App.4th 519; *In re Aljamie D.* (2000) 84 Cal.App.4th 424.)

II

*Section 361.3*

The maternal grandmother also contends the court erred because it should have applied section 361.3's relative placement preference in considering her section 388 petition or concurrent request for placement of the children with her.

A

Section 361.3, subdivision (a) provides: "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ." Section 361.3, subdivision (d) further provides: "Subsequent to the hearing conducted pursuant to Section 358, whenever a new placement of the child must be made, consideration for placement shall again be given as described in this

19

section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements. . . ."

"It is well established that the relative placement preference found in section 361.3 does not apply after parental rights have been terminated and the child has been freed for adoption." (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1031 (*Cesar V.*).) In *K.L.*, *supra*, 248 Cal.App.4th 52, the court stated: "The section 361.3 relative placement preference does not apply where . . . the social services agency is seeking an adoptive placement for a dependent child for whom the court has selected adoption as the permanent placement goal." (*Id.* at p. 66.) "[T]he [section 361.3] relative placement preference does not apply to an adoptive placement; there is no relative placement preference for adoption." (*In re A.K.* (2017) 12 Cal.App.5th 492, 498 (*A.K.*); see also, *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854-855 (*Lauren R.*); *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285-286 (*Sarah S.*).)

In *In re Maria Q.* (2018) 28 Cal.App.5th 577 (*Maria Q.*), we addressed the issue of whether section 361.3's relative placement preference "applies to a relative's request for placement after the juvenile court has held a section 366.26 hearing and the child remains in foster care pursuant to section 366.26, subdivision (b)(7)." (*Id.* at p. 581.) We concluded that section 361.3 did *not* apply after a section 366.26 order selecting a child's permanent plan, explaining that a relative's request for placement of the child at that stage of a dependency proceeding must instead be considered within the statutory framework of sections 366.26. and 366.3. (*Id.* at p. 583.) We stated that section 361.3 generally applies "[a]t the outset of the [dependency] case and during the reunification period." (*Id.* at p. 591.) In *Maria Q.*, we distinguished our prior opinion in *In re Isabella G.* (2016) 246 Cal.App.4th 708 (*Isabella G.*), noting that case involved a postreunification relative

placement, but "did not address whether the [section 361.3] relative placement preference applies after the court has held a permanency plan hearing under section 366.26." (*Maria Q.*, at p. 593.) Addressing that issue, we stated: "In view of the statutory preferences established by the Legislature to select a child's permanent plan (§ 366.26, subd. (b)), the directive in section 361.3, subdivision (a) to give 'preferential consideration . . . to a request by a relative of the child for placement of the child with the relative' does not apply. (§ 366.26, subd. (h).)" (*Id*. at p. 596.)

B

Contrary to the maternal grandmother's assertion, the court did not err by not applying the relative placement preference under section 361.3 in denying her section 388 petition or in otherwise denying her request for placement of the children with her. In February 2020, she filed her section 388 petition and concurrent request for placement of the children with her, which was during the postpermanency stage of their dependency cases and long after the August 27, 2019 section 366.26 hearing at which the court terminated the parents' parental rights and selected adoption as the children's permanent plans. As discussed *ante*, it is well established that section 361.3 does not apply after a section 366.26 hearing at which adoption is selected as a child's permanent plan. (*Cesar V.*, *supra*, 91 Cal.App.4th at p. 1031; *K.L.*, *supra*, 248 Cal.App.4th at p. 66; *A.K.*, *supra*, 12 Cal.App.5th at p. 498; *Lauren R.*, *supra*, 148 Cal.App.4th at pp. 854-855; *Sarah S.*, *supra*, 43 Cal.App.4th at pp. 285-286.) Accordingly, section 361.3's relative placement preference does not apply at this stage of the children's dependency cases. Therefore, contrary to the maternal grandmother's assertion, the court did *not* err by not applying section 361.3 in denying her section 388 petition and concurrent request for placement of the children with her. Although she cites

21

*Isabella G.*, *supra*, 246 Cal.App.4th 708, as support for her position that section 361.3 applies here, we conclude in this case, like we did in *Maria Q.*, *supra*, 28 Cal.App.5th at page 596, that because this appeal involves proceedings *after* the court's section 366.26 orders terminating the parents' parental rights and selecting the children's permanent plans, *Isabella G.* is factually and procedurally inapposite to this case and does not persuade us to reach a contrary conclusion regarding section 361.3's applicability.

## DISPOSITION

The orders are affirmed.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.